Mae C. Wu (Cal. Bar No. 216086)
Natural Resources Defense Council
1200 New York Ave., NW Suite 400
Washington, DC 20005
(202) 289-6868, Fax: (202) 289-1060
mwu@nrdc.org

James R. Wheaton (CA Bar 115230)
Lynne R. Saxton (CA Bar 226210)
Environmental Law Foundation
1736 Franklin Street, 9th Floor, Oakland, CA 94612
(510) 208-4555, Fax: (510) 208-4562
wheaton@envirolaw.org
lsaxton@envirolaw.org

Tom Neltner (IN 19246-49) *Pro Hac Vice* Application Pending
1701 Tilton Dr., Silver Spring, MD  20902
(317) 442-3973, Fax: (866) 234-8505
neltner@ikecoalition.org

E-filing

JL

Attorneys for Plaintiffs

1
2
3  **IN THE UNITED STATES DISTRICT COURT**
4  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
5  **SAN FRANCISCO DIVISION**
6

| | |
|---|---|
| 7 | ) |
| 8  SIERRA CLUB, a non-profit organization, | ) |
| 9  NATURAL RESOURCE DEFENSE COUNCIL | )  Case No: CV 08 0956 |
| 10  a non-profit organization, ALLIANCE FOR | ) |
| 11  HEALTHY HOMES, a non-profit | ) |
| 12  organization | ) |
| 13           Plaintiffs, | )  **COMPLAINT FOR** |
| 14 | )  **DECLARATORY AND** |
| 15           vs. | )  **INJUNCTIVE RELIEF** |
| 16 | ) |
| 17  STEPHEN L. JOHNSON, in his official | ) |
| 18  Capacity as Administrator of the United | ) |
| 19  States Environmental Protection Agency | ) |
| 20           Defendant. | ) |
| 21 | |

**INTRODUCTION**

1.  Plaintiffs SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") and ALLIANCE FOR HEALTHY HOMES ("AFHH") seek to compel Defendant STEPHEN L. JOHNSON, in his official capacity as Administrator of the United States Environmental Protection Agency ("EPA"), to initiate rulemaking pursuant to the Toxic Substances Control Act of 1976 (TSCA), 15 U.S.C. §§ 2601-2629 to protect the public from exposures to dangerous chemicals present in air fresheners.

2.  Air fresheners are nearly ubiquitous in the United States. Tests have shown that known carcinogens and reproductive toxins are present in some air freshener products. A vast majority of Americans are exposed to these chemicals.

3.  Because of the widespread exposure of a large percentage of the population to these dangerous chemicals, Plaintiffs petitioned EPA on September 19, 2007 to initiate rulemaking to obtain health and safety studies regarding these products and to require manufacturers to label when their products contain phthalates, a subset of certain known reproductive toxins.

4.  On December 18, 2007, EPA denied Plaintiffs' petition.

5.  Plaintiffs seek to protect the interests of their members who may suffer adverse health effects from exposure to air fresheners and whose livelihood, wellbeing and recreational activities may be impacted by air fresheners.

**JURISDICTION AND VENUE**

6.  Plaintiffs file this civil action to compel the Defendant to initiate a rulemaking proceeding as requested in the petition filed by Plaintiffs on September 19, 2007 pursuant to Section 21 of TSCA, 15 U.S.C. § 2620 (the "Petition").

1    7.    Plaintiffs have a right to bring this action pursuant to TSCA, 15 U.S.C. §

2    2620(b)(4)(A), which authorizes persons that have filed a petition under section 21 to commence

3    a civil action in a district court of the United States to compel the Administrator to initiate a

4    rulemaking proceeding as requested in the petition.

5    8.    By filing this civil action on or before February 16, 2008, Plaintiffs are filing this

6    case in a timely manner within 60 days of the Administrator's denial. *Id.* § 2620(b)(4)(A).

7    9.    The Court has jurisdiction pursuant to 15 U.S.C. § 2620(b)(4)(A) and 28 U.S.C. §

8    1331. Plaintiffs are entitled to "an opportunity to have [their] petition considered by the court in

9    a de novo proceeding." 15 U.S.C. § 2620(b)(4)(A).

10    10.    The Court has authority to award the relief sought pursuant to 15 U.S.C. §

11    2620(b)(4). For the reasons detailed below, the denial of Plaintiffs' petition challenged in this

12    case has caused, is causing, and will continue to cause injuries to Plaintiffs and their members for

13    which there is no adequate remedy at law, unless the Court grants the requested relief.

14    11.    Plaintiff Sierra Club resides in the Northern District of California. Since no real

15    property is involved in the action, venue is proper in this Court pursuant to 28 U.S.C. §

16    1391(e)(3).

17    **PARTIES**

18    12.    Plaintiff Sierra Club is one of the nation's oldest and largest environmental

19    organizations. It is a nonprofit corporation organized and existing under the laws of California.

20    For over 113 years, the Sierra Club has been dedicated to protecting our nation's natural

21    resources and public health. Sierra Club, on behalf of its members, works to protect and enhance

22    the health of the environment throughout the country. The Sierra Club has over 1.3 million

23    members and supporters living throughout the United States.

13.    Plaintiff NRDC is a national, not-for-profit membership corporation with offices in San Francisco, California; New York, New York; Washington, D.C.; Los Angeles, California; Chicago, Illinois; and Beijing, China. Founded in 1970, NRDC represents more than 420,000 members and activists nationwide, including more than 79,000 members who live in California. NRDC's membership and staff of lawyers, scientists, and other environmental specialists have a longstanding interest in protecting human health and the environment from the risks and harms associated with exposure to toxic chemicals.

14.    Plaintiff AFHH is a national non-profit, §501(c)(3) public interest organization incorporated in the State of Pennsylvania since 1990. AFHH works through policy advocacy and capacity building to prevent and eliminate hazards in homes that can harm the health of children, families, and other residents.

15.    Plaintiffs are harmed by EPA's denial of their petition. Plaintiffs' members are exposed to the chemicals in air fresheners.   This exposure is entirely unregulated by EPA. Accordingly, Plaintiffs and their members are adversely affected by the inadequate information available regarding the adverse health effects associated with exposure to air fresheners. Plaintiffs and their members are adversely affected by the lack of labels identifying whether an air freshener product contains phthalates, which are known reproductive toxins.

16.    Plaintiffs bring this action on their own behalf and on behalf of their members. Plaintiffs and their members have been and continue to be injured by EPA's denial of the Petition and failure to initiate rulemaking as requested in the Petition.

17.    Defendant Stephen L. Johnson is the Administrator of the EPA and, in that role, is charged by Congress with the duty to respond to petitions submitted pursuant to Section 21 of

1    TSCA, 15 U.S.C. § 2620, and adopt regulations pursuant to Section 6 of TSCA, *id.* § 2605, and

2    Section 8 of TSCA, *id.* § 2607.  Defendant Johnson is named solely in his official capacity.

3                          **STATUTORY FRAMEWORK**

4        18.    TSCA sets forth the framework by which EPA regulates "chemical substances

5    and mixtures which present an unreasonable risk of injury to health or the environment" and

6    takes "action with respect to chemical substances and mixtures which are imminent hazards…."

7    *Id.* § 2601(b)(12).

8        19.    TSCA also provides EPA the authority to develop adequate data on the effect of

9    chemical substances and mixtures on health and the environment, but places the responsibility of

10   developing that data on "those who manufacture and those who process such chemical

11   substances and mixtures." *Id.* §2601(b)(1).

12       20.    Under TSCA § 6, upon a finding that "there is a reasonable basis to conclude that

13   the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance

14   or mixture, or that any combination of such activities, presents or will present an unreasonable

15   risk of injury to health or the environment," EPA must promulgate a rule requiring whatever

16   action is necessary "to protect adequately against such risk using the least burdensome

17   requirement" from a list of possible requirements.  *Id.* § 2605(a).  One possible rule that EPA

18   may promulgate would require "that such substance or mixture or any article containing such

19   substance of mixture be marked with or accompanied by clear and adequate warnings and

20   instructions with respect to its use, distribution in commerce, or disposal or with respect to any

21   combination of such activities." *Id.* § 2605(a)(3).

22       21.    TSCA § 8(d) grants EPA the authority to promulgate rules that require

23   manufacturers to submit lists and copies of health and safety studies that were conducted or

initiated by the manufacturer, are known to the manufacturer, or are reasonably ascertainable by the manufacturer. *Id.* § 2607(d). EPA may exclude certain types or categories of studies if they are unnecessary to carry out the purposes of TSCA. *Id.*

22.    TSCA § 21 allows any person to petition EPA to issue a rule under TSCA § 6 or § 8 by setting forth the facts that establish that it is necessary to issue the rule. *Id.* § 2620(a). EPA must either grant or deny the petition within 90 days after filing. *Id.* § 2620(b)(3). If EPA denies the petition, the petitioner may, within 60 days, "commence a civil action in a district court of the United States to compel the Administrator to initiate a rulemaking proceeding as requested in the petition." *Id.* § 2620(b)(4). In a lawsuit challenging an agency's denial of a petition for rulemaking under sections 6 or 8, "the petitioner shall be provided an opportunity to have such petition considered by the court in a de novo proceeding." *Id.* § 2620(b)(4)(B). The court shall order EPA to initiate the rulemaking requested by the petitioner "if the petitioner demonstrates to the satisfaction of the court by a preponderance of the evidence that… there is a reasonable basis to conclude that the issuance of such a rule… is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment." *Id.* § 2620(b)(4)(B)(ii).

23.    If the court orders EPA to initiate a rulemaking, and if the court "finds that the extent of the risk to health or the environment alleged by the petitioner is less than the extent of risks to health or the environment with respect to which the Administrator is taking action under this Act and there are insufficient resources available to the Administrator to take the action requested by the petitioner," then "the court may permit the Administrator to defer initiating the action requested by the petitioner until such time as the court prescribes." *Id.* § 2620(b)(4)(B).

## STATEMENT OF FACTS

### The Petition To Initiate Rulemaking

24.     On September 19, 2007, Plaintiffs submitted the Petition to EPA (Exhibit A) requesting the Agency to take four discrete actions regarding air fresheners pursuant to TSCA § 21. The Petition requested that EPA

a.   Order manufacturers and processors of air fresheners to submit allegations of adverse reactions recorded pursuant to Section 8(c) of TSCA, 15 U.S.C. § 2607(c),

b.   Adopt a rule to require submittal of existing health and safety studies related to air fresheners pursuant to Section 8(d) of TSCA, 15 U.S.C. § 2607(d).

c.   Adopt a rule to require manufacturers to test their air freshener products for respiratory exposures and sensitization pursuant to Section 4 of TSCA, 15 U.S.C. § 2603.

d.   Adopt a rule to require labeling on all air fresheners that contain phthalates, pursuant to Section 6 of TSCA, 15 U.S.C. § 2605.

25.     On October 23, 2007, EPA published the Petition in the *Federal Register* for public comment.

26.     On December 18, 2007, EPA sent a letter to petitioners denying the Petition. ("EPA Letters to Petitioners," Exhibit B).

27.     In the EPA Letters to Petitioners, EPA enclosed copies of a letter that it sent to seven major manufacturers of air fresheners "asking for information that will enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern." ("EPA Letters to Manufacturers", Exhibit C.) EPA sent the EPA Letters to Manufacturers to the following companies: Procter & Gamble, S.C. Johnson,

1  Blyth Inc, Shell Oil Company, Lancaster Colony Corporation, Reckitt Benckiser, and The Dial

2  Corporation.

3       28.       The letters requested that each manufacturer voluntarily provide information

4  on each type of air freshener product produced by that manufacturer.  EPA requested that each

5  manufacturer provide information about the product type, all ingredients used in each product

6  type, the range of weight fractions or concentrations of each ingredient in each product type, the

7  functional uses of each ingredient in each product type, and total amount of each ingredient used

8  annually in each product type.  EPA requested that the manufacturers submit this information to

9  EPA by March 31, 2008.

10      29.       On December 21, 2007, EPA published its denial of the Petition, "Air

11  Fresheners; TSCA Section 21 Petition; Notice," in the *Federal Register* ("EPA Response,"

12  Exhibit D) 72 Fed. Reg. 72885 (December 21, 2007).

13      **Air Fresheners Pose an Unreasonable Risk of Injury to Health and the Environment**

14      30.       Air fresheners are consumer products that include various product types,

15  including sprays, outlet- and battery-operated plug-ins, solid gel dispensers, hanging car air

16  fresheners and potpourri.

17      31.       An air freshener product can be used to mask odor and/or to spread an aesthetic

18  scent in a given area.

19      32.       Air fresheners serve no public health benefits: they do not make the air cleaner or

20  healthier.  Air fresheners act by adding a chemical or a mixture of chemicals to the air that is

21  intended to be inhaled by humans.  The chemicals act by either masking odors or overwhelming

22  the human olfactory system to make objectionable odors less noticeable.

33.     In cases of mold and damp indoor environments, air fresheners may hide an indicator of potentially serious health threats to the respiratory system.

**The Widespread Exposure of the General Public to Air Fresheners**

34.     Many Americans are exposed to chemicals from air fresheners. Millions of people use air fresheners in their homes. Seventy percent of U.S. homes use air fresheners. In addition, people are also exposed to air fresheners in public bathrooms, offices, retail stores, restaurants, and other public areas.

35.     Total U.S. sales of air fresheners, excluding home fragrance products such as incense and scented candles, are expected to reach $1.72 billion (up 50 percent, or $600 million, since 2003). In 2004, the U.S. market (including incense) was estimated at $2.9 billion with market studies reporting further growth.

36.     In 2005, the American Association of Poison Control Centers ("AAPCC") documented more than 14,000 calls from people who were exposed to air fresheners and called their local poison control center. More than 2500 of those exposures resulted in injuries of some type, including one exposure that resulted in death.

**Chemicals Found In Air Fresheners Have Adverse Health Effects**

37.     Phthalates are a category of chemicals used in a variety of consumer products, including air fresheners. Phthalates are associated with a number of reproductive health risks, including changes in hormone levels and changes in genital development. Exposures to phthalates have also been associated with allergic symptoms and asthma. California's Office of Environmental Health Hazard Assessment ("OEHHA") identifies some phthalates as chemicals known to the State of California to cause reproductive toxicity under California's Safe Drinking Water and Toxic Enforcement Act of 1986, better known as Proposition 65.

1    38.    Some air fresheners have been tested and found to contain phthalates. There

2  are no specific requirements that these products must identify on their labels that they contain

3  phthalates.

4    39.    Formaldehyde is a chemical that the International Agency for Research on

5  Cancer ("IARC") classifies as a Class 1 carcinogen, which is a substance for which there is

6  sufficient evidence to conclude that they cause cancer in humans.

7    40.    Some air freshener products have been tested and found to contain

8  formaldehyde. There are no specific requirements that air fresheners must identify on their

9  labels that they contain formaldehyde.

10    41.    Benzene is a chemical that IARC classifies as a Class 1 carcinogen.

11    42.    Some air freshener products have been tested and found to contain benzene.

12  There are no specific requirements that air fresheners must identify on their labels that they

13  contain benzene.

14    43.    EPA has no rules requiring air freshener products to identify on their labels

15  that they contain any chemicals that are carcinogens or reproductive toxins.

16    44.    The AAPCC 2005 report of calls to poison control centers identified over

17  14,000 calls regarding exposure to air fresheners. This large number, however, likely

18  underrepresents the number of adverse health effects from exposure to air fresheners. The report

19  noted that "Additional exposures may go unreported to PCCs [poison control centers], and data

20  referenced from the AAPCC should not be construed to represent the complete incidence of

21  national exposure to any substance(s)." Air fresheners are not considered poisons by the general

22  public, and therefore exposures to them will rarely warrant a call to a poison control center.

45.     Even if the number of calls to poison control centers regarding exposure to air fresheners is small compared to the number of calls regarding other products, in fact, there are still at least tens of thousands of Americans who are exposed to air fresheners.   To protect this population from a potentially high risk of injury to health, EPA must obtain all available information about the health and safety of these products and require labeling to disclose the presence of certain known carcinogens and reproductive toxins.

## COUNT I

## SECTION 8 HEALTHY AND SAFETY STUDIES

46.     Plaintiffs reallege paragraphs 1 to 45 above.

47.     The Petition requested that, pursuant to TSCA § 8(d), EPA require manufacturers and processors to submit unpublished health and safety studies they have in their possession that relate to the following areas:

a.     Ingredients of air fresheners;

b.     Exposure of consumers to air fresheners;

c.     Health effects of exposure to air fresheners;

d.     Toxicity, persistence, and other characteristics of air fresheners that affect health and/or the environment.  (Petition at p. 7.)

48.     The EPA Response denied this section 8(d) request for unpublished health and safety studies for three reasons.  First, EPA claimed that to grant Plaintiffs' requests, air fresheners would have to be treated as a category of mixtures, and that the Agency was not prepared to treat them as such.   Second, EPA claimed that the Petition did not show unreasonable or significant risk.  Third, EPA claimed that the Petition did not demonstrate that

1    the rule would be necessary or appropriate to protect human health against that risk.  (EPA

2    Response at p. 72892.)

3        49.    The EPA Response also indicates that EPA considered other projects and actions

4    that require a "substantial amount" of the resources of the Agency's Office of Pollution

5    Prevention and Toxics ("OPPT").  This consideration is not a valid basis to deny a complaint

6    since it is not one of the statutory factors identify in TSCA.  The consideration of the Agency's

7    resources is only allowed after the court compels the Agency to initiate the action requested by

8    the Petition, for purposes of deferring the Agency's rulemaking, not for purposes of preventing

9    such a rulemaking.  (EPA Response at p. 72890-91.)

10        50.    Even a complete response by manufacturers to the EPA Letters to Manufacturers

11    will only provide EPA with a portion of the information it needs to conduct a full assessment of

12    the risks posed by air fresheners.  EPA has requested voluntary submissions to garner

13    information on ingredients and consumer exposure to air fresheners, which were identified by a

14    part of Plaintiffs' request.  (EPA Letters to Manufacturers at p.2.)

15        51.    However, even if manufacturers fully comply with EPA's request, those

16    submissions would not include unpublished health and safety studies on the health effects of the

17    ingredients and the toxicity, persistence, and other characteristics of the consumer's exposure.

18    The additional information from the unpublished health and safety studies are necessary to

19    enable EPA to better assess the risk posed by air fresheners.

20        52.    The burden on manufacturers to provide unpublished health and safety studies is

21    small.  There are seven major manufacturers of air fresheners and only existing health and safety

22    studies in their possession would need to be submitted.

1    53.    Air fresheners pose a significant risk to health and the environment, as explained

2    by the Petition. For example, the 2005 AAPCC report, the European Commission's Scientific

3    Committee on Health and Environmental Risks Report on Air Fresheners, and the results from

4    the 2005 study on the "National prevalence of asthma and chemical hypersensitivity: an

5    examination of potential overlap" by Caress SM and AC Steinemann all identify the risks posed

6    by chemicals that are found in air fresheners. (Petition at p. 2-5.)

7    54.    It is necessary and reasonable for EPA to issue a rule requiring submission of the

8    existing, unpublished health and safety studies to protect health or the environment against an

9    unreasonable risk of injury.

10                                **COUNT II**

11                        **SECTION 6 LABELING RULE**

12    55.    Plaintiffs re-allege paragraphs 1 through 54 from above.

13    56.    The Petition requested that EPA undertake rulemaking under Section 6 of TSCA

14    to require that labels on air fresheners identify all of their ingredients. (Petition at p. 8.)

15    57.    The EPA Response denied the request because EPA claimed that the Petition does

16    not provide a reasonable basis to conclude that air fresheners or the chemicals present in air

17    fresheners present or will present an unreasonable risk of injury to health or the environment.

18    58.    The EPA Response also indicates that EPA considered other projects and actions

19    that require a "substantial amount" of the resources of OPPT. This consideration is not a valid

20    basis to deny a petition because it is not one of the statutory factors identified in TSCA.

21    Consideration of the Agency's resources is only allowed after the court compels the Agency to

22    initiate the action requested by the Petition. (EPA Response at p. 72890-72891.)

1    59.    Air fresheners pose a significant risk to health, as demonstrated in the Petition.

2  Phthalates are known reproductive toxins found in some air fresheners. California's OEHHA

3  has identified some phthalates (including those which have been found to be present in some air

4  fresheners) as known to cause reproductive toxicity. Several studies also show that phthalates

5  are associated with a number of reproductive health risks.

6    60.    Since air fresheners serve no public health purpose, and can in fact mask public

7  health problems, the risk presented by air fresheners is unreasonable for those individuals who

8  have serious reactions when exposed to them.

9    61.    Labeling air fresheners that contain phthalates imposes a minimal burden on

10  manufacturers.

11    62.    Labeling would enable people – especially sensitive subpopulations, including

12  those who are allergic to certain phthalates, pregnant women, and parents with children – to

13  make informed purchasing decisions to avoid the dangerous reproductive toxins whenever

14  possible. It is the least burdensome requirement, among those requirements prescribed by

15  TSCA, that would adequately protect against such risk.

16    63.    It is necessary and reasonable for EPA to issue a rule requiring labeling of air

17  fresheners that contain phthalates to protect health and the environment against an unreasonable

18  risk of injury.

19                                **PRAYER FOR RELIEF**

20    64.    Defendant's denial of Plaintiffs' petition entitles Plaintiffs to relief pursuant to 15

21  U.S.C. § 2620.

22    65.    Wherefore, Plaintiffs pray that the Court grant Plaintiffs the following relief.

1          a.      Declare that Plaintiffs have demonstrated to the satisfaction of the

2   Court by a preponderance of the evidence that there is a reasonable basis to

3   conclude that the issuance of a rule or order consistent with Plaintiffs' petition is

4   necessary to protect health or the environment against an unreasonable risk of

5   injury pursuant to 15 U.S.C. §§ 2620(b)(4)(B)(i) and (ii).

6          b.      Order EPA to initiate rulemakings as Plaintiffs requested in the

7   Petition.

8          c.      Award Plaintiffs their costs of suit and reasonable fees for

9   attorneys and expert witnesses pursuant to 15 U.S.C. § 2620(b)(4)(C).

10          d.      Grant such other relief as the Court deems just and proper.

11

12   Dated: February 15, 2008                Respectfully submitted,

13
14
15                                           Mae C. Wu (Cal. Bar No. 216086)
16                                           Natrual Resources Defense Council
17                                           1200 New York Ave., NW Suite 400
18                                           Washington, DC 20005
19                                           Telephone:    (202) 289-6868
20                                           Facsimile:    (202) 289-1060
21                                           Email:        mwu@nrdc.org
22
23
24                                           Thomas Neltner (*Pro Hac Vice* application pending)
25                                           1701 Tilton Dr.
26                                           Silver Spring, MD 20902
27                                           (317) 442-3973
28                                           Fax: (866) 234-8505
29                                           neltner@ikecoalition.org
30
31
32                                           James R. Wheaton ( CA Bar 115230)
33                                           Lynne R. Saxton (CA Bar 226210)

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                    Page
15

1                             Environmental Law Foundation
2                             1736 Franklin Street, 9th Floor
3                             Oakland, CA 94612
4                             (510) 208-4555
5                             Fax: (510) 208-4562
6                             wheaton@envirolaw.org
7                             lsaxton@envirolaw.org
8
9                             Attorneys for Plaintiffs Sierra Club, Natural
10                           Resources Defense Council, and the Alliance for
11                           Healthy Homes
12

September 11, 2007

Stephen Johnson, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Commissioner Thomas Moore
U.S. Consumer Products Safety Commission
4330 East West Highway
Bethesda, MD 20814

**Re: Citizen Petition to EPA and CPSC Regarding Air Fresheners**

Dear Administrator Johnson and Commissioner Moore:

Sierra Club, Alliance for Healthy Homes, the National Center for Healthy Housing, and the
Natural Resources Defense Council (NRDC) petition the U.S. Environmental Protection Agency
(EPA) and the U.S. Consumer Products Safety Commission (CPSC) to undertake specific actions
to assess fully the risk to the public from exposure to air fresheners and to take reasonable steps to
reduce that risk.  The petitioners are national organizations committed to protecting public health.

Almost every American is exposed to air fresheners in some manner.  Millions use air fresheners
in their home.  Outside their home, they are exposed in bathrooms where air fresheners are
common.  Many offices, retail stores, and restaurants use air fresheners as well.  Often, the public
is unaware of the nature, extent, and consequences of the exposure.

American's extensive exposure to air fresheners has grown more significant in recent years.
According to a market research firm in New Jersey, total U.S. sales excluding home fragrance
products such as incense and scented candles are expected to reach $1.72 billion – up 50 percent
or $600 million since 2003.[1]  When incense is included, the U.S market was estimated at $2.9
billion in 2004[2] with market studies reporting further growth.[3]

---

[1] Louise Story, "Sensing Opportunity in Dormitory Air," *New York Times*, January 3, 2007,
www.nytimes.com/2007/01/03/business/media/03fresh.html (July 26, 2007).
[2] The-InfoShop, 2004, The U.S. Market for Home Fragrance Products, 4th Edition.  See www.the-
infoshop.com/study/pf21070_us_home_fragrance_toc.html.
[3] Mintel Report: Air Fresheners-US, Household-Feb 2006 (available at:
academic.mintel.com/sinatra/academic/index/&letter=1/display/id=112837) (stating that "From 1999 to 2004, sales
of air fresheners rose nearly 30% in current dollars. While the increase in the market is substantial, the bulk of the
growth occurred in 2000 and 2001 following the advent of air freshener candles and widespread acceptance of plug-
in air fresheners, and year-on-year sales growth has been significantly slower" and "[t]he growing Hispanic

The volatile organic compounds (VOCs) released by air fresheners are intended to be inhaled by humans.[4] People use them because of their potential impact on the olfactory system. This exposure can be significant, especially for asthmatics. A 2004 study noted that "29.7% of those with asthma said air fresheners caused breathing difficulties, and 37.2% found scented products irritating."[5] Many people may not make the connection between exposure to air fresheners and potential symptoms that they are experiencing. Those who do make the connection may call their local poison control center for advice. The American Association of Poison Control Centers (AAPCC) documented more than 14,000 calls involving actual exposure in 2005. More than 2500 exposures resulted in injuries of some type including one death.[6]

Petitioners believe, and are concerned, that air fresheners are a significant source of human exposure to a veritable cocktail of dangerous and potentially dangerous volatile organic compounds (VOCs). Compounding this concern is that fact that air fresheners provide no public health benefit: they serve primarily to mask objectionable odors. In fact, in cases of mold and damp indoor environments, air fresheners may hide an indicator of potentially serious health threats to the respiratory system.[7]

Petitioners are also concerned about how little both federal agencies and the general public understand the risks posed by exposure to the multitude of chemicals in air fresheners. As with many products, consumers may assume that if they can buy it and if they follow the directions on the label, it is a safe and healthy product. They also may assume that a federal agency has evaluated the product and carefully considered the dangers, especially on products designed to introduce a wide variety of chemicals into their lungs. Unfortunately, with regard to air fresheners, these consumers are mistaken.

There are no specific federal standards regulating air fresheners. Manufacturers and importers are not required to evaluate carefully the risk posed by the product. They are not required to make a tangible assessment of any cumulative risks posed by air fresheners or possible synergies between the different VOCs contained in the products. Rather, under the Toxic Substances Control Act § 8(e), only manufacturers who receive "information which reasonably supports the conclusion that

---

population of the U.S., identified by the Fall 2003 Simmons NCS as being more probable and more frequent air freshener users (more than whites or Asians), promises to spur increased growth.")

[4] Nazaroff for California Air Resources Board and the California Environmental Protection Agency, 2006, Indoor Air Chemistry: Cleaning Agents, Ozone and Toxic Air Contaminants, Final Report: Contract No. 01-336, See www.arb.ca.gov/research/abstracts/01-336.htm.

[5] Caress SM and AC Steinemann. 2005. National prevalence of asthma and chemical hypersensitivity: an examination of potential overlap. J Occup Environ Med. May; 47(5): 518-22.

[6] 2005 Annual Report of the American Association of Poison Control Centers' National Poisoning and Exposure Database, *Clinical Toxicology*, 44:803–932, 2006. See www.aapcc.org/2005.htm. 2005 is the most recent year available. The number and significance of the exposures were greater in 2004 with 16242 documented exposures and more moderate and major injuries. See www.aapcc.org/2004.htm.

[7] Institute of Medicine of the National Academies, *Damp Indoor Spaces and Health, National Academies Press, 2004,* ISBN 0-309-09246-9. See www.nap.edu/books/0309091934/html/. The Institute of Medicine found sufficient evidence of an association between the presence of mold and other agents in damp indoor environments and five health impacts: upper respiratory (nasal and throat) tract symptoms, coughs, wheezing, asthma symptions in sensitized persons, and hypersensitivity pneumonitis in susceptible persons.

Petition to EPA and CPSC on Air Fresheners
Page 3 of 10

such substance or mixture presents a substantial risk of injury to health or the environment" must notify EPA of that information.[8]

Under the Federal Hazardous Substances Act § 4, a manufacturer cannot introduce into commerce any "misbranded hazardous substance" or "banned hazardous substance."[9] Because the federal regulatory system relies on manufacturers and importers to evaluate the risk and report the problems, if these companies do not consistently act with the best interests of the public in mind, there are few mechanisms to alert the federal government or the public to any problems.

In the absence of federal regulation, the general public is left in the dark about the types and toxicity of chemicals being introduced into their homes. Despite the little data gathered by the government, there are reports that provide a glimpse of just how expansive the risk to public health could be. Three such reports are summarized below.

**American Association of Poison Control Centers – 2005 Annual Report**
The American Association of Poison Control Centers (AAPCC) reported that in 2005 exposure to air fresheners contributed to a death.[10] A 13-year-old died from inhaling air fresheners.

Overall, the AAPCC reported the following findings:
- 11,800 children younger than six and 14,094 people overall were exposed to air fresheners and called their local poison control center;
- 98% of these exposures were unintentional;
- 2,492 of the exposures resulted in minor injuries;
- 125 of the exposures resulted in moderate injuries; and
- 5 of the exposures resulted in major injuries.

These numbers represent only a fraction of the actual exposures that may have warranted a call to the poison center. Parents will usually call the local poison center when there is a direct and obvious exposure such as a child playing with an air freshener plugged into a wall. However, many people may not recognize the connection between an adverse health effect and their exposure to air fresheners that have been released into their indoor air environment. Therefore, the data from the AAPCC report vastly underrepresents the extent of exposure to air fresheners.

**European Commission's SCHER Report on Air Fresheners**
The Scientific Committee on Health and Environmental Risks (SCHER) is one of three non-food scientific committees that provide advice to the European Commission's Health & Consumer Protection Directorate-General. On January 27, 2006, it published its assessment of a report by the Bureau Européen des Consommateurs (BEUC) that measured and assessed the emissions of chemicals by 74 air fresheners sold in Europe.[11] The report focused on emissions of total VOCs,

---

[8] Toxic Substance Control Act, § 8(e) (15 U.S.C. § 2607(e)).
[9] Federal Hazardous Substances Act § 4 (15 U.S.C. § 1263); *see also* FHSA § 2(p) and (q) (15 U.S.C. 1261).
[10] 2005 Annual Report of the American Association of Poison Control Centers' National Poisoning and Exposure Database, *Clinical Toxicology*, 44:803–932, 2006, see Table 22, page 888.
[11] Commission's Scientific Committee on Health and Environmental Risks (SCHER), Opinion on the report "Emission of chemicals by air fresheners. Tests on 74 consumer products sold in Europe. January 2005". See at http://ec.europa.eu/health/ph_risk/committees/04_scher/docs/scher_o_026.pdf.  See also SCHER, Opinion on risk

Petition to EPA and CPSC on Air Fresheners
Page 4 of 10

allergens, benzene, formaldehyde, terpenes, styrene, diethyl phthalate, and toluene. BEUC found "for most products tested the emitted total VOC values exceeded 200 µg/m³, the proposed maximum limit value in indoor air in several countries and the emissions contained substances classified carcinogenic, such as benzene and formaldehyde, at rather high concentrations."[12]

In addressing the potential health effects of emissions from air fresheners, SCHER noted that the data on exposure was too limited. An overall exposure assessment would require more data. SCHER stated that "[e]missions from air fresheners contain many more compounds than those assessed by BEUC, and several of these may also give health effects. Furthermore, several of the primary emitted compounds may undergo reactions (e.g. with ozone, hydroxyl or nitrate radicals) to form new compounds with other effects. The real situation may be even more complicated as there may be combined effects between some of these substances, but the knowledge in this field is so far very limited."[13] SCHER stated that the "[o]verall, the BEUC study may be taken as an indication that under certain conditions notable concentrations of VOCs may result in indoor air from air fresheners."[14]

SCHER concluded that "[d]espite the limitations of the BEUC study, some observations may be made from the emissions in this specific case. Burning of incense produced abnormally high benzene concentrations in the indoor air. Because benzene is a human carcinogen, such benzene emissions need attention to diminish the exposure. For formaldehyde, styrene and toluene the highest values found in the BEUC study are below the WHO [World Health Organization] guidance values. d-Limonene concentrations obtained from natural products, gel fresheners and sprays exceed the upper value suggested for repeated exposure but not a limit based on the NOAEC [No Observed Adverse Effect Concentration] found in the critical effect study (reflecting acute irritation). "[15] Although total VOCs exceeded limits adopted by several countries, SCHER questioned the value in using it to predict health effects, because the actual composition of total VOCs would vary.[16] "The guidance values used in the SCHER evaluation cover to some extent the vulnerable groups but the most sensitive persons (e.g. people having asthma, children) may already react at these concentrations."[17]

SCHER continued that the results of from the BEUC study could even underestimate exposure to the emissions from air fresheners because of other conditions such as "concomitant use of several air fresheners, smaller room volumes, less ventilation, addition to high background values from other sources." In addition, "[t]he substances studied by BEUC all have higher vapour densities than air, and concentrations close to the floor may therefore be higher than in the point of measurement. Also droplets from spray products may reach the floor before total evaporation, which may increase the concentrations there. These circumstances can give an elevated exposure

---

assessment on indoor air quality, 2007 at
http://ec.europa.eu/health/ph_risk/committees/04_scher/docs/scher_o_055.pdf.
[12] Id at page 11.
[13] Id at 12.
[14] Id at 14.
[15] Id.
[16] Id.
[17] Id.

to children playing on the floor, due also to a breathing rate which, calculated per unit bodyweight, is twice that of an adult over the first 12 years of life (Gerdes et al, 2004)."[18]

Most importantly, SCHER recommended further research on emissions from and consumers use pattern of air fresheners, actual use data, new studies to identify compounds in the emissions, especially from the combustion/pyrolysis processes in candles and incense (including dioxins as the temperature seems to be in the optimal range for formation of these types of compounds) and more data on fine and ultra fine particles.[19]

**Natural Resources Defense Council Report on Phthalates in Air Fresheners**
NRDC recently tested a number of air fresheners currently on the market specifically for the presence of phthalates. Phthalates are associated with a number of reproductive health risks, including changes in hormone levels and changes in genital development.[20] Exposures to phthalates have also been associated with allergic symptoms and asthma.[21] California's Office of Environmental Health Hazard Assessment lists some phthalates (including some found in these air fresheners) as chemicals known to the state to cause reproductive toxicity under California's Proposition 65 ("Prop 65").[22] As reported in "Not So Fresh: Hidden Hazards in Air Fresheners," NRDC's independent testing found phthalates in 86% of air freshener products tested; however, none of the products listed phthalates on their labels.[23] In fact, some air fresheners labeled as "all-natural" and "unscented" contained measurable amounts of phthalates.

In addition to the data gaps on exposure from air fresheners, there is little toxicity data available on many of the chemicals found air fresheners. The identities and concentrations of the organic chemicals used in an air freshener are closely-held secrets by the manufacturers. Petitioners understand that EPA does not know the ingredients of most of the air fresheners on the market and, even if it did, EPA would have, at best, only basic screening information on those chemicals. But even with the screening information, the Screening Information Data Set tests do not sufficiently identify the presence of chemicals that cause chronic respiratory tract impacts, and particularly not the complex mixtures of chemicals used in air fresheners. Petitioners reviewed EPA's High Production Volume Information System[24] for the common fragrances found in air fresheners in the BEUC/ICRT study[25] and found no repeat dose toxicity studies for respiratory exposure.

---

[18] Id at 15.
[19] Id.
[20] K. M. Main et al., "Human Breast Milk Contamination with Phthalates and Alterations of Endogenous Reproductive Hormones in Infants Three Months of Age," *Environmental Health Perspectives* 114 (2006), pp.270-276; R. Hauser et al., "Altered Semen Quality in Relation to Urinary Concentrations of Phthalate Monoester and Oxidative Metabolites," *Epidemiology* 17, no. 6 (2006), pp. 682-691; S. H. Swan et al., "Decrease in Anogenital Distance among Male Infants with Prenatal Phthalate Exposure," *Environmental Health Perspectives* 113 (2007), pp. *1056-61.*
[21] C.G. Bornehag et al., "The association between asthma and allergic symptoms in children and phthalates in house dust: a nested case-control study," *Environmental Health Perspectives* 112 (2004), pp. 1393-7.
[22] California Safe Drinking Water and Toxic Enforcement Act of 1986.
[23] Cohen, Alison. "Not So Fresh: Toxic Chemicals in Air Fresheners." Natural Resources Defense Council. September 2007.
[24] www.epa.gov/hpvis/
[25] BEUC / International Consumer Research & Testing, *Emission of chemicals by air fresheners. Tests on 74 consumer products sold in Europe,* (2005).

Petition to EPA and CPSC on Air Fresheners
Page 6 of 10

Petitioners also reviewed manufacturers' material safety data sheets (MSDS) for various air fresheners. Despite the widespread use of air fresheners, manufacturers appear to have no information on the potential respiratory hazards associated with their products. For example, since 2001, Canada has required manufacturers to report "Respiratory Tract Sensitization" on the MSDS.[26] However, a review of more than 25 MSDSs for air fresheners written pursuant to those regulations, all of which were available for purchase in the United States, noted that there was "No Data Available" as the response for "Respiratory Tract Sensitization."

Petitioners believe that data on respiratory tract sensitization and other health impacts from respiratory exposure to air fresheners should be available to EPA, CPSC, and the general public so they can assess the potential risk associated with inhaling these products. If the information is not available, EPA should require that the manufacturers of air fresheners conduct the necessary testing and make that information available. When EPA assembles the information in a comprehensive compilation can it adequately assess and reveal the risk to the public.

Altogether, it becomes alarmingly apparent that the federal government and the general public have scant information about what toxins, how many different toxins, and how much of each toxin they are releasing purposely into their homes. Therefore, we petition EPA and CPSC to gather that data and act to protect the public health.

For purposes of these petitions, "air freshener" refers to a broad range of product types, from traditional sprays to outlet- and battery-operated plug-ins, solid gel dispenses, hanging car air fresheners and potpourri. Air fresheners can serve two purposes: odor control (which includes unscented air fresheners) and aesthetic scent. Some products may serve both purposes, and others may serve only one. Cleaning products that kill germs, clean surfaces and leave a pleasant fragrance are not included in these petitions.

## PETITION TO U.S. ENVIRONMENTAL PROTECTION AGENCY

The Sierra Club, Alliance for Healthy Homes, National Center for Healthy Housing, and the Natural Resources Defense Council petition EPA pursuant to the Toxic Substances Control Act ("TSCA") § 21, 15 U.S.C. § 2620 to:

1.    Call-in allegations of adverse reactions recorded by manufacturers and processors pursuant to TSCA § 8(c) and 40 CFR 717.
2.    Adopt a rule pursuant to TSCA § 8(d) to require submittal of health and safety studies related to air fresheners, including lab results of ingredients and health effects from respiratory exposures.
3.    Adopt a rule pursuant to TSCA § 4 to require manufacturers to test their products for respiratory exposures and sensitization.
4.    Adopt a rule pursuant to TSCA § 6 to require labeling on all air fresheners that contain phthalates.

---

[26] Workplace Hazardous Materials Information System (WHMIS), CPR Section 32 (Classes of Controlled Products – Definitions), Section 56 (Respiratory Tract Sensitizer). See Reference Manual for the WHMIS Requirements of the *Hazardous Products Act* and Controlled Products Regulations the Hazardous Products Act and Controlled Products Regulations. See also www2.worksafebc.com/publications/OHSRegulation/HazardousProductsAct.asp.

## Section 8(c) Call-In

According to 40 CFR 717, manufacturers and processors of chemical substances and mixtures such as air fresheners must record allegations that the chemical substance or mixture caused a significant adverse reaction to their health or the environment. A significant adverse reaction is "a substantial impairment of normal activities or long-lasting or irreversible damage to health or the environment."[27] Effects already reported in scientific publications or in MSDSs do not have to be recorded.

Petitioners request that EPA exercise its authority under 40 CFR 717.17 and request that the following manufacturers and processors report such allegations they have received related to air freshener products:

1.  Blyth, Inc., One East Weaver Street, Greenwich, CT, 203-661-1926, www.blyth.com
2.  Lancaster Colony Corporation, 37 W. Broad Street, Columbus, Ohio 43215, www.lancastercolony.com
3.  Limited Brands, Three Limited Parkway, Columbus, OH 43230, www.limitedbrands.com/index.jsp
4.  Procter & Gamble, One Procter & Gamble Plaza, Cincinnati, OH 45202, www.pg.com
5.  Reckitt Benckiser, 103-105 Bath Road, Slough, Berkshire SL1 3UH, UK, www.reckittbenckiser.com
6.  SC Johnson & Son, 1525 Howe St., Racine, WI 53403-5011, www.scjbrands.com
7.  SOPUS, TSP19, PO Box 4427, Houston, TX 77210-4427, www.auto-expressions.net
8.  The Dial Corporation, 15501 N. Dial Blvd, Scottsdale, AZ 85260-1619, www.dialcorp.com
9.  Sara Lee Corporation, 3500 Lacey Road, Downers Grove, IL 60515-5424, www.saralee.com

Petitioners believe these nine companies are the primary manufacturers and processors of air fresheners sold in the United States. By focusing its resources on this group, EPA should be able to assess the extent of the problems with air freshener exposure fairly. Because a request involving nine entities would not be subject to the Paperwork Reduction Act notice requirements, EPA could act quickly.

## Section 8(d) Call-In

Petitioners request that EPA require manufacturers and processors to submit unpublished health and safety studies they have in their possession that relate to the following areas:

1.  Ingredients of air fresheners;
2.  Exposure of consumers to air fresheners
3.  Health effects of exposure to air fresheners
4.  Toxicity, persistence, and other characteristics of air fresheners that affect health and/or the environment.

These studies will provide EPA with the essential information it needs to assess the merits of the potential allegations and understand the impacts of the air fresheners on human health.

---

[27] 40 CFR 717.3(i)

## Section 4 Testing

Petitioners request that EPA adopt a rule pursuant to TSCA § 4 to require manufacturers to conduct acute and chronic studies that use appropriate exposure routes and that capture a diversity of life stages and health conditions, such as asthma, for large populations of mammals evaluating the impact of air fresheners on human health. These tests must consider the byproducts of a reaction of the air fresheners with ozone and analyze both exposure and sensitization.

Petitioners believe that EPA has sufficient basis to issue a TSCA Section 4 Test Rule. The research shows that air fresheners may pose a risk to public health as identified above. In addition to the direct health effects, air fresheners may present an unreasonable risk because they may mask the presence of the potentially dangerous condition of mold in damp indoor environments. They meet the requirements in § 4(a) for an "A" hazard/risk finding. Since air fresheners only serve a cosmetic purpose, that risk is unreasonable. Air fresheners can be eliminated from consumer use without significant disruption to the consumers.

Air fresheners also meet the requirements for § 4(b) for a "B" exposure finding. At $2.9 billion in sales, these products are produced in substantial quantities. The research makes clear that there is significant human exposure to the air fresheners. The more than 14,000 consumer exposures documented by the AAPCC that resulted in a call to a poison control center exceeds the 10,000 consumer threshold. Virtually every American is exposed to air fresheners. The European research shows that the potential risk from this exposure is significant.

Finally, there are insufficient data and experiences upon which the effects of air fresheners on the general public can reasonably be determined or predicted, and testing is necessary to develop the needed data. EPA and the public need to know whether air fresheners pose a respiratory sensitization hazard.

## Section 6 Labeling

Petitioners request that EPA require that air freshener be labeled to identify all their ingredients pursuant to TSCA § 6(a)(3). This labeling requirement will provide at least some protection to sensitive subpopulations – such as people who are allergic to one or more of the ingredients and pregnant women and children who would be exposed to chemicals have known reproductive toxicity – as well as the general public from the various adverse health risks associated with some of the ingredients.

A manufacturer or importer is well aware of the ingredients of their product; as such, requiring them to list those ingredients would impart an insignificant cost. Air fresheners provide no public health value, and consumers should be given the opportunity to make an informed choice about whether to introduce voluntarily those unnecessary chemicals into their homes. Because of the anticipated toxicity associated with many of these chemicals, requiring labels on air fresheners to identify their ingredients can result in significant potential gains and improvements to public health.

Petition to EPA and CPSC on Air Fresheners
Page 9 of 10

## PETITION TO U.S. CONSUMER PRODUCTS SAFETY COMMISSION
Sierra Club, Alliance for Healthy Homes, National Center for Healthy Housing, and NRDC petition CPSC pursuant to the Administrative Procedures Act, 5 U.S.C. § 553(e) to:
1. Ban the use of toxins in air fresheners, and
2. Promulgate consumer product safety standards requiring that all air fresheners be labeled with the full list of ingredients present.

### Ban Toxins in Air Fresheners
Petitioners request that the CPSC declare that air fresheners containing one or more of the chemicals present on the California Proposition 65 list of chemicals known to cause cancer and chemicals known to cause reproductive toxicity be declared banned hazardous substances, as defined by the Federal Hazardous Substances Act, 15 U.S.C. § 1261(q)(1) ("FHSA"). Furthermore, Petitioners request CPSC to promulgate regulations banning any air fresheners containing those Prop 65 chemicals. These chemicals are toxic substances, which have "the capacity to produce personal...illness to man through ingestion, inhalation, or absorption through any body surface."[28]

The chemicals that fall on the Prop 65 list have been identified to cause cancer or reproductive toxicity in humans by the state of California. Because air fresheners are household products explicitly intended to be released into the air and inhaled by the consumer, the proper and intended use will necessarily result in the continuous inhalation of any toxins present in the product. Inhalation of toxins give rise to many dangerous adverse human health effects. Therefore, public health can only be served adequately by preventing these known toxins from entering the household air and from being continuously inhaled. Any air freshener that contains and emits a known toxin into the household air must be declared to be banned hazardous substances and taken out of the channels of interstate commerce.

### Promulgate a Labeling Rule
Petitioners request that the CPSC immediately promulgate a consumer product safety standard requiring air fresheners to be labeled to identify their full list of ingredients. A label identifying all the ingredients in an air freshener will alert the general public to all carcinogens and reproductive toxins that are present in the air freshener. Even after air fresheners containing Prop 65 chemicals are banned, a labeling rule requiring a full listing of ingredients will protect those people who have special sensitivities to allergens, which may not be reproductive toxins or carcinogens.

For more information or questions, please contact:

      Tom Neltner
      1701 Tilton Dr.
      Silver Spring, MD  20902
      317-442-3973
      neltner@ikecoalition.org

---

[28] FHSA § 1261(g).

Petition to EPA and CPSC on Air Fresheners
Page 10 of 10

Respectfully submitted,

Ed Hopkins
Sierra Club

Robert Zdenek
Alliance for Healthy Homes

Rebecca Morley
National Center for Healthy Housing

Mae C Wu
Natural Resources Defense Council



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

## DEC 1 8 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Rebecca Morley, Executive Director
National Center for Healthy Housing
10227 Wincopin Cir.
American City Building, Suite 100
Columbia, MD 21044

      Re: <u>TSCA Section 21 Petition concerning air fresheners</u>

Dear Ms. Morley:

      The U.S. Environmental Protection Agency (EPA) has completed its review of your petition concerning air fresheners filed with EPA under section 21 of the Toxic Substances Control Act (TSCA) on September 20, 2007.

      EPA has reviewed the information submitted as part of the petition as well as additional information you provided. EPA has also reviewed additional information obtained by EPA or already in EPA's possession and information submitted in public comments. Based on this review and a careful consideration of your specific requests, EPA is denying the petition. The rationale for EPA's decision on each of your requests is set out in the enclosed pre-publication copy of the Federal Register notice that will be published within a few days.

      Enclosed, for your information, are copies of letters that EPA is sending to several major manufacturers of air fresheners, asking for information that will enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

                    Sincerely,

                    James B. Gulliford
                    Assistant Administrator

Enclosures



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON, D.C. 20460

**DEC 18 2007**

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Ed Hopkins, Director
Environmental Quality Programs
Sierra Club Legislative Office
408 C St., NE
Washington, D.C. 20002

Re: TSCA Section 21 Petition concerning air fresheners

Dear Mr. Hopkins:

The U.S. Environmental Protection Agency (EPA) has completed its review of your petition concerning air fresheners filed with EPA under section 21 of the Toxic Substances Control Act (TSCA) on September 20, 2007.

EPA has reviewed the information submitted as part of the petition as well as additional information you provided. EPA has also reviewed additional information obtained by EPA or already in EPA's possession and information submitted in public comments. Based on this review and a careful consideration of your specific requests, EPA is denying the petition. The rationale for EPA's decision on each of your requests is set out in the enclosed pre-publication copy of the Federal Register notice that will be published within a few days.

Enclosed, for your information, are copies of letters that EPA is sending to several major manufacturers of air fresheners, asking for information that will enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Sincerely,

James B. Gulliford
Assistant Administrator

Enclosures



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

DEC 18 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Robert Zdenek, Executive Director
Alliance for Healthy Homes
P.O. Box 75941
Washington, D.C. 20013

Re: <u>TSCA Section 21 Petition concerning air fresheners</u>

Dear Mr. Zdenek:

The U.S. Environmental Protection Agency (EPA) has completed its review of your petition concerning air fresheners filed with EPA under section 21 of the Toxic Substances Control Act (TSCA) on September 20, 2007.

EPA has reviewed the information submitted as part of the petition as well as additional information you provided. EPA has also reviewed additional information obtained by EPA or already in EPA's possession and information submitted in public comments. Based on this review and a careful consideration of your specific requests, EPA is denying the petition. The rationale for EPA's decision on each of your requests is set out in the enclosed pre-publication copy of the Federal Register notice that will be published within a few days.

Enclosed, for your information, are copies of letters that EPA is sending to several major manufacturers of air fresheners, asking for information that will enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Sincerely,

James B. Gulliford
Assistant Administrator

Enclosures



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

## DEC 1 8 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

H. Fisk Johnson, Ph.D.
Chairman and CEO
S. C. Johnson & Son, Inc.
1525 Howe Street
Racine, WI 53403-5011

Dear Dr. Johnson:

      As you may know, several environmental and health advocacy groups recently petitioned the U.S. Environmental Protection Agency (EPA) to take several regulatory actions concerning air freshener products under the Toxic Substances Control Act (TSCA). EPA announced receipt of, and sought public comment on, this petition in the Federal Register on October 23, 2007 (72 FR 60016). The petitioners are concerned about the safety of air fresheners. The petition asked EPA to require that manufacturers report allegations of significant adverse reactions to EPA under TSCA section 8(c), submit health and safety studies to EPA under TSCA section 8(d), conduct acute and chronic toxicity testing under TSCA section 4(a), and label products under TSCA section 6(a).

      After careful consideration, EPA denied the petition requests. The reasons for EPA's denial will soon be published in the Federal Register, a copy of which will be provided to you. However, in consideration of the broad usage of air freshener products in U.S. homes and the potential value in improved understanding of the ingredients used in air fresheners, EPA has concluded that it would be prudent and consistent with the Agency's mission to protect human health and the environment to gather additional information on air freshener ingredients.

      Consequently, EPA believes that information on your air freshener products would enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

      Through this letter, therefore, I am requesting that your company voluntarily provide the following information for each type of air freshener product produced by your company (including but not limited to the following product types: aerosol sprays, pump sprays/spritzes, outlet- and battery-operated plug-ins, gels, solids, hanging car air fresheners, and potpourri). To enable more efficient evaluation of the information by EPA, I request that you provide the following ingredient/formulation and volume information in electronic format, preferably in a spreadsheet or database:

- Product type;
- List of all ingredients regardless of the quantity used and including chemical substances comprising any mixtures used in the product type,
  - by specific chemical name and
  - associated Chemical Abstract Service (CAS) number;
- Range of weight fractions or concentrations of each ingredient in each product type;
- Functional use(s) of each ingredient in each product type (i.e., what function(s) is the chemical substance performing in the product?); and
- Total amount (pounds) of each ingredient used on an annual basis in each product type.

You are requested to make submissions via hand-delivery/delivery service to the following addresses on or before March 31, 2008. Preferred submission media via hand-delivery/courier are disks or CD-ROMs. Submissions of disks or CD-ROMs via U.S. mail are discouraged because security measures currently in place may damage the contents of disks and CD-ROMs.

Hand-delivery/Delivery service:    OPPT Document Control Office (7407M)
                                   EPA East - Room 6428
                                   U.S. Environmental Protection Agency
                                   1201 Constitution Avenue, NW
                                   Washington, DC 20460
                                   Attn: TSCA Section 21

You may claim the information you submit as Confidential Business Information (CBI). Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you deliver/courier to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR Part 2.

I hope that S. C. Johnson & Son will respond positively to the request made in this letter. If you have any questions, please contact Robert Jones in OPPT's Chemical Control Division at 202-564-8161.

Sincerely,

James B. Gulliford
Assistant Administrator



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

DEC 1 8 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Mr. Kenneth Cassidy
Director, Regulatory Affairs
Lancaster Colony Corporation
37 W. Broad Street
Columbus, OH 43230

Dear Mr. Cassidy:

As you may know, several environmental and health advocacy groups recently petitioned the U.S. Environmental Protection Agency (EPA) to take several regulatory actions concerning air freshener products under the Toxic Substances Control Act (TSCA). EPA announced receipt of, and sought public comment on, this petition in the Federal Register on October 23, 2007 (72 FR 60016). The petitioners are concerned about the safety of air fresheners. The petition asked EPA to require that manufacturers report allegations of significant adverse reactions to EPA under TSCA section 8(c), submit health and safety studies to EPA under TSCA section 8(d), conduct acute and chronic toxicity testing under TSCA section 4(a), and label products under TSCA section 6(a).

After careful consideration, EPA denied the petition requests. The reasons for EPA's denial will soon be published in the Federal Register, a copy of which will be provided to you. However, in consideration of the broad usage of air freshener products in U.S. homes and the potential value in improved understanding of the ingredients used in air fresheners, EPA has concluded that it would be prudent and consistent with the Agency's mission to protect human health and the environment to gather additional information on air freshener ingredients.

Consequently, EPA believes that information on your air freshener products would enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Through this letter, therefore, I am requesting that your company voluntarily provide the following information for each type of air freshener product produced by your company (including but not limited to the following product types: aerosol sprays, pump sprays/spritzes, outlet- and battery-operated plug-ins, gels, solids, hanging car air fresheners, and potpourri). To enable more efficient evaluation of the information by EPA, I request that you provide the following ingredient/formulation and volume information in electronic format, preferably in a spreadsheet or database:

Internet Address (URL) ● http://www.epa.gov
Recycled/Recyclable ●Printed with Vegetable Oil Based Inks on 100% Postconsumer, Process Chlorine Free Recycled Paper

- Product type;
- List of all ingredients regardless of the quantity used and including chemical substances comprising any mixtures used in the product type,
  - by specific chemical name and
  - associated Chemical Abstract Service (CAS) number;
- Range of weight fractions or concentrations of each ingredient in each product type;
- Functional use(s) of each ingredient in each product type (i.e., what function(s) is the chemical substance performing in the product?); and
- Total amount (pounds) of each ingredient used on an annual basis in each product type.

You are requested to make submissions via hand-delivery/delivery service to the following addresses on or before March 31, 2008. Preferred submission media via hand-delivery/courier are disks or CD-ROMs. Submissions of disks or CD-ROMs via U.S. mail are discouraged because security measures currently in place may damage the contents of disks and CD-ROMs.

Hand-delivery/Delivery service:     OPPT Document Control Office (7407M)
                                    EPA East - Room 6428
                                    U.S. Environmental Protection Agency
                                    1201 Constitution Avenue, NW
                                    Washington, DC 20460
                                    Attn: TSCA Section 21

You may claim the information you submit as Confidential Business Information (CBI). Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you deliver/courier to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR Part 2.

I hope that Lancaster Colony Corporation will respond positively to the request made in this letter. If you have any questions, please contact Robert Jones in OPPT's Chemical Control Division at 202-564-8161.

Sincerely,

James B. Gulliford
Assistant Administrator



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

DEC 1 8 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Rob Harrington, Ph.D., D.A.B.T.
Director, Regulatory & Safety
Blyth Inc.
603 Kingsland drive
Batavia, IL 60510

Dear Dr. Harrington:

As you may know, several environmental and health advocacy groups recently petitioned the U.S. Environmental Protection Agency (EPA) to take several regulatory actions concerning air freshener products under the Toxic Substances Control Act (TSCA). EPA announced receipt of, and sought public comment on, this petition in the Federal Register on October 23, 2007 (72 FR 60016). The petitioners are concerned about the safety of air fresheners. The petition asked EPA to require that manufacturers report allegations of significant adverse reactions to EPA under TSCA section 8(c), submit health and safety studies to EPA under TSCA section 8(d), conduct acute and chronic toxicity testing under TSCA section 4(a), and label products under TSCA section 6(a).

After careful consideration, EPA denied the petition requests. The reasons for EPA's denial will soon be published in the Federal Register, a copy of which will be provided to you. However, in consideration of the broad usage of air freshener products in U.S. homes and the potential value in improved understanding of the ingredients used in air fresheners, EPA has concluded that it would be prudent and consistent with the Agency's mission to protect human health and the environment to gather additional information on air freshener ingredients.

Consequently, EPA believes that information on your air freshener products would enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Through this letter, therefore, I am requesting that your company voluntarily provide the following information for each type of air freshener product produced by your company (including but not limited to the following product types: aerosol sprays, pump sprays/spritzes, outlet- and battery-operated plug-ins, gels, solids, hanging car air fresheners, and potpourri). To enable more efficient evaluation of the information by EPA, I request that you provide the following ingredient/formulation and volume information in electronic format, preferably in a spreadsheet or database:

- Product type;
- List of all ingredients regardless of the quantity used and including chemical substances comprising any mixtures used in the product type,
  - by specific chemical name and
  - associated Chemical Abstract Service (CAS) number;
- Range of weight fractions or concentrations of each ingredient in each product type;
- Functional use(s) of each ingredient in each product type (i.e., what function(s) is the chemical substance performing in the product?); and
- Total amount (pounds) of each ingredient used on an annual basis in each product type.

You are requested to make submissions via hand-delivery/delivery service to the following addresses on or before March 31, 2008. Preferred submission media via hand-delivery/courier are disks or CD-ROMs. Submissions of disks or CD-ROMs via U.S. mail are discouraged because security measures currently in place may damage the contents of disks and CD-ROMs.

Hand-delivery/Delivery service:    OPPT Document Control Office (7407M)
EPA East - Room 6428
U.S. Environmental Protection Agency
1201 Constitution Avenue, NW
Washington, DC 20460
Attn: TSCA Section 21

You may claim the information you submit as Confidential Business Information (CBI). Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you deliver/courier to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR Part 2.

I hope that Blyth Inc. will respond positively to the request made in this letter. If you have any questions, please contact Robert Jones in OPPT's Chemical Control Division at 202-564-8161.

Sincerely,

James B. Gulliford
Assistant Administrator

EPA Letters to Manufacturers - Exhibit C - 6

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

## DEC 18 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Ms. Eileen G. Moyer
Manager of Regulatory Relations
Reckitt Benckiser, Inc.
Morris Corporate Center IV
399 Interpace Parkway, P.O. Box 225
Parsippany, NJ 07054-0225

Dear Ms. Moyer:

As you may know, several environmental and health advocacy groups recently petitioned the U.S. Environmental Protection Agency (EPA) to take several regulatory actions concerning air freshener products under the Toxic Substances Control Act (TSCA). EPA announced receipt of, and sought public comment on, this petition in the Federal Register on October 23, 2007 (72 FR 60016). The petitioners are concerned about the safety of air fresheners. The petition asked EPA to require that manufacturers report allegations of significant adverse reactions to EPA under TSCA section 8(c), submit health and safety studies to EPA under TSCA section 8(d), conduct acute and chronic toxicity testing under TSCA section 4(a), and label products under TSCA section 6(a).

After careful consideration, EPA denied the petition requests. The reasons for EPA's denial will soon be published in the Federal Register, a copy of which will be provided to you. However, in consideration of the broad usage of air freshener products in U.S. homes and the potential value in improved understanding of the ingredients used in air fresheners, EPA has concluded that it would be prudent and consistent with the Agency's mission to protect human health and the environment to gather additional information on air freshener ingredients.

Consequently, EPA believes that information on your air freshener products would enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Through this letter, therefore, I am requesting that your company voluntarily provide the following information for each type of air freshener product produced by your company (including but not limited to the following product types: aerosol sprays, pump sprays/spritzes, outlet- and battery-operated plug-ins, gels, solids, hanging car air fresheners, and potpourri). To enable more efficient evaluation of the information by EPA, I request that you provide the following ingredient/formulation and volume information in electronic format, preferably in a spreadsheet or database:

- Product type;
- List of all ingredients regardless of the quantity used and including chemical substances comprising any mixtures used in the product type,
  - by specific chemical name and
  - associated Chemical Abstract Service (CAS) number;
- Range of weight fractions or concentrations of each ingredient in each product type;
- Functional use(s) of each ingredient in each product type (i.e., what function(s) is the chemical substance performing in the product?); and
- Total amount (pounds) of each ingredient used on an annual basis in each product type.

You are requested to make submissions via hand-delivery/delivery service to the following addresses on or before March 31, 2008. Preferred submission media via hand-delivery/courier are disks or CD-ROMs. Submissions of disks or CD-ROMs via U.S. mail are discouraged because security measures currently in place may damage the contents of disks and CD-ROMs.

Hand-delivery/Delivery service:    OPPT Document Control Office (7407M)
EPA East - Room 6428
U.S. Environmental Protection Agency
1201 Constitution Avenue, NW
Washington, DC 20460
Attn: TSCA Section 21

You may claim the information you submit as Confidential Business Information (CBI). Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you deliver/courier to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR Part 2.

I hope that Reckitt Benckiser, Inc. will respond positively to the request made in this letter. If you have any questions, please contact Robert Jones in OPPT's Chemical Control Division at 202-564-8161.

Sincerely,

James B. Gulliford
Assistant Administrator

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

DEC 18 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Ms. Sara Glenn
Director, Federal Government Relations
Shell Oil Company
1401 I Street, N.W.
Suite 1030
Washington, D.C. 20005

Dear Ms. Glenn:

As you may know, several environmental and health advocacy groups recently petitioned the U.S. Environmental Protection Agency (EPA) to take several regulatory actions concerning air freshener products under the Toxic Substances Control Act (TSCA).  EPA announced receipt of, and sought public comment on, this petition in the Federal Register on October 23, 2007 (72 FR 60016).  The petitioners are concerned about the safety of air fresheners.  The petition asked EPA to require that manufacturers report allegations of significant adverse reactions to EPA under TSCA section 8(c), submit health and safety studies to EPA under TSCA section 8(d), conduct acute and chronic toxicity testing under TSCA section 4(a), and label products under TSCA section 6(a).

After careful consideration, EPA denied the petition requests.  The reasons for EPA's denial will soon be published in the Federal Register, a copy of which will be provided to you. However, in consideration of the broad usage of air freshener products in U.S. homes and the potential value in improved understanding of the ingredients used in air fresheners, EPA has concluded that it would be prudent and consistent with the Agency's mission to protect human health and the environment to gather additional information on air freshener ingredients.

Consequently, EPA believes that information on your air freshener products would enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Through this letter, therefore, I am requesting that your company voluntarily provide the following information for each type of air freshener product produced by your company (including but not limited to the following product types: aerosol sprays, pump sprays/spritzes, outlet- and battery-operated plug-ins, gels, solids, hanging car air fresheners, and potpourri). To enable more efficient evaluation of the information by EPA, I request that you provide the following ingredient/formulation and volume information in electronic format, preferably in a spreadsheet or database:

- Product type;
- List of all ingredients regardless of the quantity used and including chemical substances comprising any mixtures used in the product type,
  - by specific chemical name and
  - associated Chemical Abstract Service (CAS) number;
- Range of weight fractions or concentrations of each ingredient in each product type;
- Functional use(s) of each ingredient in each product type (i.e., what function(s) is the chemical substance performing in the product?); and
- Total amount (lbs) of each ingredient used on an annual basis in each product type.

You are requested to make submissions via hand-delivery/delivery service to the following addresses on or before March 31, 2008. Preferred submission media via hand-delivery/courier are disks or CD-ROMs. Submissions of disks or CD-ROMs via U.S. mail are discouraged because security measures currently in place may damage the contents of disks and CD-ROMs.

Hand-delivery/Delivery service:     OPPT Document Control Office (7407M)
                                    EPA East - Room 6428
                                    U.S. Environmental Protection Agency
                                    1201 Constitution Avenue, NW
                                    Washington, DC 20460
                                    Attn: TSCA Section 21

You may claim the information you submit as Confidential Business Information (CBI). Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you deliver/courier to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR Part 2.

I hope that SOPUS will respond positively to the request made in this letter. If you have any questions, please contact Robert Jones in OPPT's Chemical Control Division at 202-564-8161.

Sincerely,

James B. Gulliford
Assistant Administrator



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

DEC 1 8 2007

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Ms. Suzanne Hagen
Manager of Regulatory Affairs
The Dial Corporation
15501 North Dial Boulevard
Scottsdale, AZ 85260-1619

Dear Ms. Hagen:

As you may know, several environmental and health advocacy groups recently petitioned the U.S. Environmental Protection Agency (EPA) to take several regulatory actions concerning air freshener products under the Toxic Substances Control Act (TSCA). EPA announced receipt of, and sought public comment on, this petition in the Federal Register on October 23, 2007 (72 FR 60016). The petitioners are concerned about the safety of air fresheners. The petition asked EPA to require that manufacturers report allegations of significant adverse reactions to EPA under TSCA section 8(c), submit health and safety studies to EPA under TSCA section 8(d), conduct acute and chronic toxicity testing under TSCA section 4(a), and label products under TSCA section 6(a).

After careful consideration, EPA denied the petition requests. The reasons for EPA's denial will soon be published in the Federal Register, a copy of which will be provided to you. However, in consideration of the broad usage of air freshener products in U.S. homes and the potential value in improved understanding of the ingredients used in air fresheners, EPA has concluded that it would be prudent and consistent with the Agency's mission to protect human health and the environment to gather additional information on air freshener ingredients.

Consequently, EPA believes that information on your air freshener products would enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Through this letter, therefore, I am requesting that your company voluntarily provide the following information for each type of air freshener product produced by your company (including but not limited to the following product types: aerosol sprays, pump sprays/spritzes, outlet- and battery-operated plug-ins, gels, solids, hanging car air fresheners, and potpourri). To enable more efficient evaluation of the information by EPA, I request that you provide the following ingredient/formulation and volume information in electronic format, preferably in a spreadsheet or database:

Internet Address (URL) • http://www.epa.gov
Recycled/Recyclable •Printed with Vegetable Oil Based Inks on 100% Postconsumer, Process Chlorine Free Recycled Paper

- Product type;
- List of all ingredients regardless of the quantity used and including chemical substances comprising any mixtures used in the product type,
  - by specific chemical name and
  - associated Chemical Abstract Service (CAS) number;
- Range of weight fractions or concentrations of each ingredient in each product type;
- Functional use(s) of each ingredient in each product type (i.e., what function(s) is the chemical substance performing in the product?); and
- Total amount (pounds) of each ingredient used on an annual basis in each product type.

You are requested to make submissions via hand-delivery/delivery service to the following addresses on or before March 31, 2008. Preferred submission media via hand-delivery/courier are disks or CD-ROMs. Submissions of disks or CD-ROMs via U.S. mail are discouraged because security measures currently in place may damage the contents of disks and CD-ROMs.

Hand-delivery/Delivery service:     OPPT Document Control Office (7407M)
                                    EPA East - Room 6428
                                    U.S. Environmental Protection Agency
                                    1201 Constitution Avenue, NW
                                    Washington, DC 20460
                                    Attn: TSCA Section 21

You may claim the information you submit as Confidential Business Information (CBI). Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you deliver/courier to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR Part 2.

I hope that The Dial Corporation will respond positively to the request made in this letter. If you have any questions, please contact Robert Jones in OPPT's Chemical Control Division at 202-564-8161.

Sincerely,

James B. Gulliford
Assistant Administrator



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

**DEC 18 2007**

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Mr. Rick Hackman
Associate Director
NA Regulatory Affairs
Procter & Gamble
1 Procter & Gamble Plaza
Cincinnati, OH 45202

Dear Mr. Hackman:

As you may know, several environmental and health advocacy groups recently petitioned the U.S. Environmental Protection Agency (EPA) to take several regulatory actions concerning air freshener products under the Toxic Substances Control Act (TSCA). EPA announced receipt of, and sought public comment on, this petition in the Federal Register on October 23, 2007 (72 FR 60016). The petitioners are concerned about the safety of air fresheners. The petition asked EPA to require that manufacturers report allegations of significant adverse reactions to EPA under TSCA section 8(c), submit health and safety studies to EPA under TSCA section 8(d), conduct acute and chronic toxicity testing under TSCA section 4(a), and label products under TSCA section 6(a).

After careful consideration, EPA denied the petition requests. The reasons for EPA's denial will soon be published in the Federal Register, a copy of which will be provided to you. However, in consideration of the broad usage of air freshener products in U.S. homes and the potential value in improved understanding of the ingredients used in air fresheners, EPA has concluded that it would be prudent and consistent with the Agency's mission to protect human health and the environment to gather additional information on air freshener ingredients.

Consequently, EPA believes that information on your air freshener products would enable the Agency to further evaluate whether air fresheners contain ingredients that may result in exposures of potential concern.

Through this letter, therefore, I am requesting that your company voluntarily provide the following information for each type of air freshener product produced by your company (including but not limited to the following product types: aerosol sprays, pump sprays/spritzes, outlet- and battery-operated plug-ins, gels, solids, hanging car air fresheners, and potpourri). To enable more efficient evaluation of the information by EPA, I request that you provide the following ingredient/formulation and volume information in electronic format, preferably in a spreadsheet or database:

- Product type;
- List of all ingredients regardless of the quantity used and including chemical substances comprising any mixtures used in the product type,
  - by specific chemical name and
  - associated Chemical Abstract Service (CAS) number;
- Range of weight fractions or concentrations of each ingredient in each product type;
- Functional use(s) of each ingredient in each product type (i.e., what function(s) is the chemical substance performing in the product?); and
- Total amount (pounds) of each ingredient used on an annual basis in each product type.

You are requested to make submissions via hand-delivery/delivery service to the following addresses on or before March 31, 2008. Preferred submission media via hand-delivery/courier are disks or CD-ROMs. Submissions of disks or CD-ROMs via U.S. mail are discouraged because security measures currently in place may damage the contents of disks and CD-ROMs.

Hand-delivery/Delivery service:    OPPT Document Control Office (7407M)
                                   EPA East - Room 6428
                                   U.S. Environmental Protection Agency
                                   1201 Constitution Avenue, NW
                                   Washington, DC 20460
                                   Attn: TSCA Section 21

You may claim the information you submit as Confidential Business Information (CBI). Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you deliver/courier to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR Part 2.

I hope that Procter & Gamble will respond positively to the request made in this letter. If you have any questions, please contact Robert Jones in OPPT's Chemical Control Division at 202-564-8161.

Sincerely,

James B. Gulliford
Assistant Administrator



**Friday,**
**December 21, 2007**

Part IV

# Environmental
# Protection Agency

**Air Fresheners; TSCA Section 21 Petition;**
**Notice**

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OPPT–2007–1016; FRL–8345–9]**

### Air Fresheners; TSCA Section 21 Petition

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** On September 20, 2007, the Sierra Club, the National Center for Healthy Housing, the Alliance for Healthy Homes, and the Natural Resources Defense Council (NRDC) petitioned EPA under section 21 of the Toxic Substances Control Act (TSCA) to: Call-in allegations of adverse reactions related to air freshener products recorded by manufacturers and processors pursuant to TSCA section 8(c) and 40 CFR part 717; adopt a rule pursuant to TSCA section 8(d) to require submittal of heath and safety studies related to air fresheners, including lab results of ingredients and health effects from respiratory exposures; adopt a rule pursuant to TSCA section 4 to require manufacturers to conduct acute and chronic studies to evaluate the impact of air fresheners on human health; and adopt a rule pursuant to TSCA section 6 to require that air fresheners be labeled to identify all of their ingredients. TSCA section 21 does not apply to the petitioners' request for a call-in under TSCA section 8(c), and, for the reasons set forth in this notice, EPA has denied the petitioners' remaining three requests.

**FOR FURTHER INFORMATION CONTACT:** *For general information contact*: Colby Lintner, Regulatory Coordinator, Environmental Assistance Division (7408M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001; telephone number: (202) 554–1404; e-mail address: *TSCA-Hotline@epa.gov*.

*For technical information contact*: Robert Jones, Chemical Control Division (7405M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001; telephone number: (202) 564–8161; e-mail address: *jones.robert @epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. General Information

### A. Does this Action Apply to Me?

You may be potentially affected by this action if you manufacture, process, import, or distribute in commerce air fresheners or their ingredients.

Potentially affected entities may include, but are not limited to:

• Chemical manufacturers (including importers) and processors (NAICS code 325), e.g., air and room freshener manufacturers.

• Other manufacturers (including importers) and processors (NAICS code 3399), e.g., manufacturers of potpourri.

This listing is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this action. Other types of entities not listed in this unit could also be affected. The North American Industrial Classification System (NAICS) codes have been provided to assist you and others in determining whether this action might apply to certain entities. To determine whether you or your business may be affected by this action, you should carefully examine the TSCA section 21 petition on air fresheners. If you have any questions regarding the applicability of this action to a particular entity, consult the technical person listed under **FOR FURTHER INFORMATION CONTACT**.

### B. How Can I Get Copies of this Document and Other Related Information?

1. *Docket*. EPA has established a docket for this action under docket identification (ID) number EPA–HQ–OPPT–2007–1016. All documents in the docket are listed in the docket's index available at *http://www.regulations.gov*. Although listed in the index, some information is not publicly available, e.g., Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available electronically at *http:// www.regulations.gov*, or, if only available in hard copy, at the OPPT Docket. The OPPT Docket is located in the EPA Docket Center (EPA/DC) at Rm. 3334, EPA West Bldg., 1301 Constitution Ave., NW., Washington, DC. The EPA/DC Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. The telephone number of the EPA/DC Public Reading Room is (202) 566–1744, and the telephone number for the OPPT Docket is (202) 566–0280. Docket visitors are required to show photographic identification, pass through a metal detector, and sign the EPA visitor log. All visitor bags are processed through an X-ray machine and subject to search. Visitors will be provided an EPA/DC badge that must be

visible at all times in the building and returned upon departure.

2. *Electronic access*. You may access this **Federal Register** document electronically through the EPA Internet under the "**Federal Register**" listings at *http://www.epa.gov/fedrgstr*.

## II. Background

### A. What is a TSCA Section 21 Petition?

Section 21 of TSCA allows any person to petition EPA to initiate a rulemaking proceeding for the issuance, amendment, or repeal of a rule under TSCA section 4, 6, or 8 or an order under TSCA section 5(e) or 6(b)(2). A TSCA section 21 petition must set forth the facts that are claimed to establish the necessity for the action requested. EPA is required to grant or deny the petition within 90 days of its filing. If EPA grants the petition, the Agency must promptly commence an appropriate proceeding. If EPA denies the petition, the Agency must publish its reasons for the denial in the **Federal Register**. A petitioner may commence a civil action in a U.S. district court to compel initiation of the requested rulemaking proceeding within 60 days of either a denial or the expiration of the 90 day period.

### B. What Criteria Apply to a Decision on a TSCA Section 21 Petition?

1. *Legal standard regarding TSCA section 21 petitions*. Section 21(b)(1) of TSCA requires that the petition "set forth the facts which it is claimed establish that it is necessary" to issue the rule or order requested. 15 U.S.C. 2620(b)(1). Thus, TSCA section 21 implicitly incorporates the statutory standards that apply to the requested actions. In addition, TSCA section 21 establishes standards a court must use to decide whether to order EPA to initiate rulemaking in the event of a lawsuit filed by the petitioner after denial of a TSCA section 21 petition. 15 U.S.C. 2620(b)(4)(B). Accordingly, EPA has relied on the standards in TSCA section 21 and in the provisions under which actions have been requested to evaluate this petition.

2. *Legal standard regarding TSCA section 8(d) rules*. Section 8(d) of TSCA authorizes EPA to require the submission of unpublished health and safety studies initiated or conducted by, or known to or reasonably ascertainable by, manufacturers, processors, and distributors of chemical substances or mixtures. Studies may be excluded "if the Administrator finds that submission of lists of such studies are unnecessary to carry out the purposes of [TSCA]." 15 U.S.C. 2607(d)(1).

Section 21(b)(4)(B) of TSCA provides the standard for judicial review should EPA deny a request for rulemaking under TSCA section 8(d): "If the petitioner demonstrates to the satisfaction of the court by a preponderance of the evidence that ...there is a reasonable basis to conclude that the issuance of such a rule ...is necessary to protect health or the environment against an unreasonable risk of injury," the court shall order the Administrator to initiate the requested action. 15 U.S.C. 2620(b)(4)(B).

3. *Legal standard regarding TSCA section 4 rules.* EPA must make several findings in order to issue a rule to require testing under TSCA section 4. In all cases, EPA must find that data and experience are insufficient to reasonably determine or predict the effects of a chemical or mixture on health or the environment and that testing of the chemical is necessary to develop the missing data. 15 U.S.C. 2603(a)(1). In addition, EPA must find either that the chemical or mixture may present an unreasonable risk of injury or that the chemical is produced in substantial quantities and may either result in significant or substantial human exposure or result in substantial environmental release. Id.

In the case of a mixture, EPA must also find that "the effects which the mixture's manufacture, distribution in commerce, processing, use, or disposal or any combination of such activities may have on health or the environment may not be reasonably and more efficiently determined or predicted by testing the chemical substances which comprise the mixture." 15 U.S.C. 2603(a)(2).

If EPA denies a petition for TSCA section 4 rulemaking and the petitioners challenge that decision, TSCA section 21 allows a court to order EPA to initiate rulemaking if the petitioner demonstrates to the satisfaction of the court by a preponderance of the evidence in a *de novo* proceeding that findings very similar to those described in this unit with respect to a chemical substance have been met. However, TSCA section 21 omits the finding that "testing is necessary to develop the data" from the findings that a petitioner must demonstrate in order for a court to require EPA to initiate TSCA section 4 rulemaking. 15 U.S.C. 2620(b)(4)(B)(i). Nonetheless, EPA believes TSCA section 21(b)(4) is best interpreted as incorporating this finding. The alternative would be to read the statute as empowering a court to require EPA to initiate a rulemaking even where the Agency could not make proposed findings consistent with TSCA section 4

or take final action on the rule. EPA's interpretation is supported by legislative history. House Conference Report 94–1679 at pp. 97–99 (1976).

In addition, EPA believes TSCA section 21(b)(4) does not provide for judicial review of a petition to promulgate a test rule for mixtures. Section 21(b)(4)(B)(i) of TSCA specifies that the court's review pertains to application of the TSCA section 4 factors to chemical substances. Moreover, TSCA section 21(b)(4)(B)(i) does not contain the additional finding that TSCA section 4 requires for issuing a test rule for mixtures (that the effect may not be reasonably and more efficiently determined or predicted by testing the chemical components). Congress left the complex issues associated with the testing of mixtures to the Administrator's discretion.

4. *Legal standard regarding TSCA section 6 rules.* In order to promulgate a rule under TSCA section 6, the Administrator must find that "there is a reasonable basis to conclude that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture . . . presents or will present an unreasonable risk." 15 U.S.C. 2605(a). This finding cannot be made considering risk alone. In promulgating any rule under TSCA section 6(a), the statute requires that the Administrator consider:

• The effects of such substance or mixture on health and the magnitude of the exposure of human beings to such substance or mixture.

• The effects of such substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture.

• The benefits of such substance or mixture for various uses and the availability of substitutes for such uses.

• The reasonably ascertainable economic consequences of the rule, after consideration of the effect on the national economy, small business, technological innovation, the environment, and public health. 15 U.S.C. 2605(c)(1).

Furthermore, the control measure adopted is to be the "least burdensome requirement" that adequately protects against the unreasonable risk. 15 U.S.C. 2605(a).

Section 21(b)(4)(B) of TSCA provides the standard for judicial review should EPA deny a request for rulemaking under TSCA section 6(a): "If the petitioner demonstrates to the satisfaction of the court by a preponderance of the evidence that ... there is a reasonable basis to conclude that the issuance of such a rule ... is

necessary to protect health or the environment against an unreasonable risk of injury," the court shall order the Administrator to initiate the requested action. 15 U.S.C. 2620(b)(4)(B).

*C. What Action is Requested Under this TSCA Section 21 Petition?*

On September 19, 2007, the Sierra Club, the National Center for Healthy Housing, the Alliance for Healthy Homes, and NRDC petitioned EPA to:

1. Call-in allegations of adverse reactions related to air freshener products recorded by manufacturers and processors pursuant to TSCA section 8(c) and 40 CFR part 717.

2. Adopt a rule pursuant to TSCA section 8(d) to require submittal of health and safety studies related to air fresheners, including lab results of ingredients and health effects from respiratory exposures.

3. Adopt a rule pursuant to TSCA section 4 to require manufacturers to conduct acute and chronic studies to evaluate the impact of air fresheners on human health.

4. Adopt a rule pursuant to TSCA section 6 to require that air fresheners be labeled to identify all of their ingredients (Ref. 1).

The petition defined air fresheners as:

...a broad range of product types, from traditional sprays to outlet- and battery-operated plug-ins, solid gel dispensers, hanging car air fresheners and potpourri. Air fresheners can serve two purposes: odor control (which includes unscented air fresheners) and aesthetic scent. Some products may serve both purposes, and others may serve only one. Cleaning products that kill germs, clean surfaces and leave a pleasant fragrance are not included in these petitions. (Ref. 1)

The petitioners also simultaneously petitioned the Consumer Product Safety Commission (CPSC) under the Federal Hazardous Substances Act (FHSA) (15 U.S.C. 1261 *et seq.*) "to undertake specific actions to assess fully the risk to the public from exposure to air fresheners and to take reasonable steps to reduce that risk" (Ref. 1). In November 2007, the CPSC declined to docket the petition for rulemaking, because it did not meet the CPSC's statutory or regulatory requirements (Ref. 2). CPSC stated that it was rejecting the petition because the petition did not "identify the specific toxic constituent(s) and their concentration(s) in the air fresheners, the mechanism of exposure and/or uptake of each such constituent or the 'substantial illness' that might result from customary or reasonably foreseeable handling or use of such air fresheners that contain each

of these substances." CPSC also found that the petition did not "provide[] sufficient information to establish that a rule is necessary."

*D. What Support Do the Petitioners Offer for These Requests?*

Petitioners are concerned about potential risks from air fresheners and believe EPA should take the requested actions to assess and reduce any such risks. The petition discusses at length three reports in support of these requests:

• The American Association of Poison Control Centers' (AAPCC) 2005 Annual Report (Ref. 3).

• An "opinion" issued in January 2006 by the European Commission's Scientific Committee on Health and Environmental Risks (SCHER) (Ref. 4) on a report issued in January 2005 by the Bureau Européen des Unions de Consommateurs (BEUC), which measured and assessed chemical emissions from 74 air fresheners sold in Europe (Ref. 5).

• A report issued in September 2007 by NRDC on the presence of phthalate esters in air fresheners (Ref. 6).

1. *Association of Poison Control Centers (AAPCC) Report.* In support of the assertion that air fresheners present "a significant source of human exposure to a veritable cocktail of dangerous and potentially dangerous" chemicals, the petition presents information drawn from the AAPCC 2005 Annual Report. EPA considered the AAPCC report and does not agree with the petitioners that the information in the report raises significant concerns about possible health effects of air fresheners.

According to the petition (Ref. 1), the AAPCC reported the following "exposures" to air fresheners based on calls to local poison control centers in 2005: 14,094 people overall (including 11,800 children younger than 6). Of the reported exposures, the petition indicates that 98% were unintentional, and 2,623 resulted in injuries (2,492 minor injuries; 125 moderate injuries; 5 major injuries; and 1 death).

These numbers, however, represent only a very small percentage (0.58%) of the total number of 2,424,180 exposures to all substances reported in the AAPCC's 2005 Annual Report (Ref. 3). This incidental percentage is the more striking considering the industry's assertion that 70% of U.S. homes use air fresheners (Ref. 7) and the petitioners' assertion that "[a]lmost every American is exposed to air fresheners in some manner" (Ref. 1). Moreover, according to the 2005 AAPCC report, only 32 (0.23%) of the 14,094 reported air freshener exposures involved an adverse

reaction, which is defined by AAPCC as "an adverse event occurring with normal, prescribed, labeled, or recommended use of the product, as opposed to overdose, misuse, or abuse" (Ref. 3).

Considering the widespread use of air fresheners, the number of reported exposure incidents for air fresheners is relatively small when compared to the reported exposure incidents for other product categories. In the AAPCC report, air fresheners are one of five subcategories of deodorizers, and deodorizers have among the lowest number of reported exposures and injuries among the 55 categories in the AAPCC report (Refs. 3 and 8). In the AAPCC report, deodorizers are not included in the list of 23 categories "most frequently involved in human exposures" (Refs. 3 and 8). Deodorizers are 20th among 23 categories for "most frequently involved in pediatric exposures (children younger than 6 years)," but deodorizers were involved in only 1.3% of the total number of such exposures (Ref. 3). (The percentages for the 21st (asthma therapies), 22nd (dietary supplements/herbals/homeopathic), and 23rd (antidepressants) categories were 1.2%, 1.1%, and 1.1%, respectively, nearly the same as for deodorizers). Nearly 95% of the injuries resulting from air freshener exposures were minor, 4.8% were moderate, and only 0.2% (5) were major. Of the two deaths reported, one resulted from intentional misuse and the reason for the other was reported as "unknown" (Refs. 3 and 8).

The petitioners assert that these figures under-represent exposures because people may not recognize the relationship asserted by the petitioners between air freshener exposures and adverse effects (Ref. 1). On the other hand, EPA recognizes that asthma attacks and other health effects may be incorrectly attributed by callers to air freshener exposures. EPA has no basis to draw conclusions based on the possibility of unreported exposures to air fresheners or any other products. It is also important to note that these exposure reports, which provide the basis for the AAPCC report, rarely, if ever, include information about the concentrations or durations of the reported exposures and, therefore, cannot be used to make any conclusions about actual exposures during use or long-term health risks (Ref. 9).

2. *NRDC Report.* According to the petition, NRDC tested 14 air fresheners and found phthalate esters in 12 (Ref. 6). NRDC stated that none of these 12 air fresheners listed phthalate esters as ingredients on their labels. According to the petition, phthalate esters are

associated with "a number of reproductive health risks" and with allergic symptoms and asthma. The petitioners also state that "California's Office of Environmental Health Hazard Assessment lists some phthalates (including some found in these air fresheners) as chemicals known to the state to cause reproductive toxicity under California's Proposition 65" (Ref. 1).

Phthalate esters are a broad category of chemicals with varying toxicological profiles. California Proposition 65 (the Safe Drinking Water and Toxic Enforcement Act of 1986) requires the State to publish a list of chemicals known to be carcinogens or developmental toxicants and requires businesses to provide public notice about any "significant" amount of a listed chemical in their products by, among other methods, labeling a consumer product (*http://www.oehha.ca.gov/prop65.html*) (Ref. 11). Of the five phthalate esters on the Proposition 65 list, only one (di-*n*-butyl phthalate (DBP)) was reported in the NRDC study as being detected in air fresheners. According to the U.S. Centers for Disease Control Third National Report on Human Exposure to Environmental Chemicals, many consumer products contain phthalate esters, including vinyl flooring, adhesives, detergents, lubricating oils, solvents, automotive plastics, plastic clothing (e.g., raincoats), personal-care products (e.g., soap, shampoo, deodorants, fragrances, hair spray, nail polish), medical pharmaceuticals, plastic bags, garden hoses, inflatable recreational toys, blood-storage bags, intravenous medical tubing, and children's toys (Ref. 10).

The NRDC study tested for 15 phthalate esters (including 4 of the 5 phthalate esters on the Proposition 65 list) and found one or more of 5 phthalate esters (including 1 (DBP) on the Proposition 65 list) in 12 of 14 air freshener products tested. The 5 phthalate esters were: Di-*n*-butyl phthalate (DBP), CAS No. 84–74–2; diethyl phthalate (DEP), CAS No. 84–66–2; diisobutyl phthalate (DIBP), CAS No. 84–69–5; diisohexyl phthalate (DIHP), CAS No.146–50–9; and dimethyl phthalate (DMP), CAS No. 131–11–3 (Ref. 6).

With the exception of DEP, the phthalate esters were detected at very low concentrations (less than 7 parts per million (ppm)), which might indicate their presence as an impurity or lab contaminant rather than as an intentional ingredient. DBP was the only phthalate ester on the California Proposition 65 list (where it is listed for

developmental toxicity) detected in the air fresheners examined in the NRDC report. DBP was detected at very low concentrations in 5 samples: At concentrations less than 1 ppm in four samples and at a concentration of 4.5 ppm in one sample.

DEP was detected in three samples at concentrations of 360 ppm, 1,100 ppm, and 7,300 ppm; DEP was detected in six other samples at concentrations of 6.3 ppm or less (Ref. 6). DEP is known to be used as a solvent and vehicle in a wide variety of fragrance and cosmetic products at concentrations ranging from <0.1% to 11% (i.e., 1,000 to 110,000 ppm) (Ref. 29), which could explain its detection at concentrations in the thousands of ppm in several air fresheners reported by NRDC. While higher than the very low levels of other detected phthalate esters, the levels of DEP in air fresheners identified in the NRDC Report are still quite low. In 2003, the European Union's (EU) Scientific Committee on Cosmetic Products and Non–Food Products Intended for Consumers (SCCNFP), a scientific advisory body to the European Commission (as is the EU's SCHER that is cited by the petitioners), concluded that the safety profile of DEP supports its use in European cosmetic products at "current levels" (Refs. 12 and 13).

The petitioners also referenced several studies in footnotes within the petition and in a public comment that reported possible associations between general exposure to phthalate esters (i.e., not specifically from exposure to air fresheners) and potential adverse health effects in humans. The NRDC report did not measure nor estimate the potential exposures or risks that may result from the use of air fresheners in which phthalate esters have been detected and so does not provide a basis to assess such exposure or potential risk. There are numerous other potential sources of phthalate esters to which consumers may be exposed that could lead to potentially higher exposures than those that may result from use of air fresheners.

In 2007, following release of a report by Greenpeace that reported concentrations of phthalate esters in perfumes (Ref. 14), the EU's Scientific Committee on Consumer Products (SCCP) issued an opinion on certain phthalate esters in cosmetic products (Ref. 15). The SCCP opinion addressed nine phthalate esters including four of the five phthalate esters detected in air freshener samples by NRDC. The magnitude of the phthalate ester concentrations reported in the Greenpeace report for perfumes are similar to those reported by NRDC.

DIHP, detected by NRDC at a concentration of 2.1 ppm in one air freshener, was not included in the SCCP opinion. The SCCP concluded that: There was no need to update the SCCNFP opinion on the safe use of DEP in cosmetics; in view of the low concentrations of DIBP and DMP found in samples analyzed (38 and 2,982 ppm, respectively), there would be no quantifiable risk for the consumer; and that traces of DBP up to 100 ppm do not indicate a risk to the health of the consumer. Similarly, the Cosmetic Ingredient Review Expert Panel concluded in 2002/2003 that DBP, DMP, and DEP are safe for use in cosmetic products (including perfumes and hair sprays) "in the present practices of use and concentrations" (Ref. 29).

EPA recently contracted with the National Academy of Sciences (NAS) to evaluate human health risks and the potential for conducting a cumulative risk assessment for phthalate esters (Ref. 16). (Project information is available at *http://www8.nationalacademies.org/cp/ projectview.aspx?key=48860*). Specifically, EPA is eliciting external expert consultation to evaluate the issues related to cumulative hazard and dose–response assessment. The study panel will examine the strengths and limitations of a cumulative approach opposed to or in addition to an individual chemical approach for risk assessment of phthalates. EPA anticipates that the final product of this study panel will be a report discussing the issues identified by the panel, the ways in which any assessment may be approached, the strengths and limitations of any of the proposed approaches, and whether any additional research is needed. The project began in September 2007 and NAS is scheduled to submit a report in December 2008.

In addition, EPA has developed five individual phthalate human health risk assessments (DEP, DMP, di(2-ethylhexyl)phthalate, dibutyl phthalate, and butyl benzyl phthalate) that are currently available on the Integrated Risk Information System (IRIS) database. The IRIS Summaries for these phthalates can be found at *http:// cfpub.epa.gov/ncea/iris/ index.cfm?fuseaction= iris.showSubstanceList*. The IRIS Program has also undertaken reassessments for di(2-ethylhexyl)phthalate, dibutyl phthalate, and butyl benzyl phthalate. The schedules for the reassessments of these phthalates are available on IRIS Track *http://cfpub.epa.gov/ncea/iristrac/ index.cfm*).

In sum, the NRDC report indicates that some phthalate esters are present in

some air fresheners at generally low concentrations. This information is not surprising and does not provide a basis to suspect that the presence of the phthalate esters at the concentrations detected presents a significant public health risk. In addition, the NAS evaluation, which is expected to address phthalate esters more comprehensively, rather than in a very specific use such as air fresheners, will help inform any risk assessment or testing needs.

3. *BEUC and SCHER reports*. The petition also relies on an opinion issued by SCHER in January 2006 about a report issued by the Bureau Européen des Unions de Consommateurs (BEUC) in January 2005 that measured and assessed chemical emissions from 74 air fresheners sold in Europe (Refs. 4 and 5).

In order to understand these reports, some background information is necessary. BEUC is a European association of national consumer organizations. In November 2004, BEUC announced that a study it had commissioned had found that air fresheners emitted toxic air pollutants (Ref. 17). According to the report, the study tested 74 "products belonging to different categories (incense, natural products, scented candles, aerosols, liquid diffusers, electric diffusers and gels)," "simulate[ed] common use of such products by consumers," and measured, "for each product, the concentration of Volatile Organic Compounds (VOCs) and aldehydes in the air after the use" (Ref. 5). The BEUC report focused on emissions of "total VOCs" and several individual VOCs: Allergens, benzene, formaldehyde, terpenes, styrene, DEP, and toluene. The BEUC report found that the 74 products studied emitted over 350 different chemicals.

A company that produces air fresheners filed a lawsuit in Belgium to compel BEUC to withdraw public statements indicating "that normal usage of the fragrances generates serious health risks, and that these fragrances are not subjected to regulations in terms of product safety standards" (Ref. 28). In March 2005, the court found that the BEUC study did not support statements that air fresheners were "dangerous to people's health." The court ordered BEUC to withdraw statements that "might or could create the impression that fragrances are unsafe with normal usage" and issue a statement that its "repeated public communications on the subject of air freshener safety" were "not appropriate as the currently known results from [the BEUC study] on which [BEUC] based [its] statements in effect do not justify the conclusion that air

fresheners are diffusing substances ... in concentrations that present a hazard to public health'' and ''may unjustly have generated the unwarranted impression that the air fresheners on sale in the Netherlands can result in health risk under normal usage.''

SCHER was subsequently asked to consider whether the specific chemical emissions from air fresheners reported in the BEUC study represented a health risk to consumers and what further studies might be necessary to adequately assess the potential health risks from air fresheners. SCHER issued its assessment in January 2006 (Ref. 4). SCHER noted that ''Neither the composition of the tested products, nor the rationale for the selection of the individual substances studied are given in the BEUC report;'' that ''[t]he individual compounds in the reported results are, in most cases, well studied;'' and that ''[t]he results in the BEUC study may ... be regarded as realistic worst case values.'' SCHER noted that, with the exception of benzene emissions resulting from the burning of certain incense products, the air concentrations of the substances assessed in the BEUC report were below known limit values for adverse health effects and/or were within the range of typical indoor air concentrations.

SCHER reached the general conclusion that current scientific knowledge on ''the use of air fresheners, emissions and resulting concentrations in indoor air'' was ''limited'' and that ''the [exposure] data on air fresheners available to the SCHER are insufficient for an overall risk evaluation for consumers.'' SCHER concluded that ''[m]ore data, on e.g. the use pattern of these products, are required to allow assessment of the actual exposure of the residents'' and that, in particular, ''the frequency of the used air freshener, the duration of exposure and the frequency of peak levels needs to be considered.''

EPA conducted a literature review of sources of information relevant to human exposure to air freshener products (i.e., formulation, emission measurement, air monitoring, and modeling information) (Ref. 21). This review identified additional studies not reviewed in the BEUC and SCHER reports. Some of the same analytes reported in the BEUC report (e.g., terpenes and formaldehyde) were detected in these studies, usually at lower maximum concentrations than those reflected in the BEUC report.

EPA then reviewed the BEUC and SCHER reports in light of the information gathered during the literature review (Ref. 18). EPA concluded, as did the SCHER report, that there were deficiencies related to the quality of the data in the BEUC report. EPA concluded that the information and findings in the BEUC report did not appear to satisfy EPA's Information Quality Guidelines (Ref. 19). EPA also concluded that uncertainty about how representative the BEUC results are for the U.S. air freshener market is a key limitation in their usefulness for estimating potential U.S. consumer exposures.

The petitioners point out that BEUC found that ''for most products tested the emitted total VOC values exceeded 200 microgram/milligram cubed ($\mu g/m^3$), the proposed maximum limit value in indoor air in several countries...'' While total VOC does measure the presence of VOCs indoors, there is no validated evidence to indicate that this measure is a predictor of indoor air quality concerns or potential health effects. Total VOC does not indicate the impact of other pollutants present or building factors that may also impact indoor air quality and health. In addition, there is no standardized procedure for measuring total VOCs and, therefore, no ability to compare between reported measurements. Although under certain conditions total VOC measurements may be useful as a screening tool, EPA does not believe total VOC measurements should be used as an indicator of indoor air quality or health concerns.

4. *Epidemiological studies and other information.* In addition to the three sources listed in Unit II.D., the petitioners submitted to EPA epidemiological studies as additional support (Refs. 22 and 23). Reference 23 was submitted as part of the petition. Reference 22 was submitted after the petition and, consequently, is not considered by EPA to be part of the petition. However, EPA reviewed both studies. The studies attempted to determine whether there was an association between asthma and either the use of common household cleaners or chemical hypersensitivity. EPA's review concluded that both studies, neither of which was specifically designed to evaluate possible health effects related to exposure to air fresheners, contained numerous design limitations and could not be used to support an association between asthma and the use of air fresheners (Ref. 20).

Petitioners also present certain arguments about the risks and benefits of air fresheners. Petitioners assert that ''air fresheners provide no public health value'' (Ref. 1). Petitioners further assert that air fresheners may mask the presence of mold and other health threats (Ref 1). Petitioners have provided no basis for EPA to evaluate these assertions, although EPA agrees that, in general, air fresheners are not a solution for indoor air quality issues. In addition, public health value is not the only type of benefit cognizable under TSCA. As petitioners recognize, air fresheners are purchased in large quantities, and, as noted in comments submitted by industry, 70% of homes in the United States use air fresheners (Ref. 7); which together suggest that consumers place significant value on them. With regard to petitioners' second assertion, EPA sees no connection between the actions requested and any risk that might be presented by the masking of mold or similar conditions.

5. *Conclusion.* The information provided by petitioners does not support the conclusion that air fresheners present a significant health risk, or a health risk that is a priority in relation to risks potentially posed by other chemicals or products. In addition to the limitations discussed in Unit II.D., it is clear that the information supplied by petitioners is only a sample of the information available on health risks potentially associated with air fresheners. Based on comments received during the comment period and independent inquiry by EPA (see Unit III.C.1.), there are a number of additional publicly available studies and analyses of the potential health effects from air fresheners and air freshener ingredients. Industry commenters assert that some of these studies demonstrate that air fresheners in general do not present a significant risk (Refs. 24 and 25). EPA expresses no view on this industry characterization, but EPA cannot judge whether air fresheners generally, or any particular air fresheners, present an unreasonable risk, or a significant risk at all, without further review of available information.

*E. Other Considerations*

EPA has a number of high priority chemical assessment and risk management projects and actions already underway that are requiring a substantial amount of OPPT resources. EPA views many of these projects as being more broadly applicable, and as having greater potential to result in the understanding and reduction of possible chemical risks, than the actions suggested by the petitioners. These projects include, for example, the following:

In August 2007, the President committed the United States to join Canada and Mexico in a collaborative effort under the Security and Prosperity Partnership (SPP) to rapidly and efficiently improve chemical security

and safety throughout North America. The U.S. contribution to this partnership is, by 2012, to assess and initiate needed actions on the approximately 9,000 chemicals manufactured in, or imported into, the United States in volumes greater than 25,000 pounds. These include 3,000 ''high-production-volume'' (HPV) chemicals (produced or imported at 1 million lbs/year annually) and 6,000 ''medium-production-volume'' MPV chemicals (produced or imported between 25,000 and 1 million lbs/year). EPA expects that many of the ingredients of air fresheners will be encompassed within these groups of chemicals. The North American collaboration also provides for the sharing of scientific information and technical understanding, best practices, and research on new approaches to chemical testing and assessment. The scope and pace of this commitment represents a significant commitment of Agency resources over the period of the next 5 years. Additional information on this commitment can be found at: *http://www.epa.gov/chemrtk/index.htm.*

Another, chemical-specific, project involves conducting and integrating new studies into the ongoing risk assessment on perfluorooctanoic acid (PFOA) and managing the related 2010/ 15 PFOA Stewardship Program, in which companies have committed to reduce emissions and product content of PFOA and other perfluorinated compounds, many of which have been found in the blood of the general U.S. population. Additional information on this project can be found at: *http://www.epa.gov/oppt/pfoa/index.htm.*

In addition, EPA has several efforts underway under the Design for the Environment (DfE) Program. DfE works in partnership with a broad range of stakeholders to reduce risk to people and the environment by preventing pollution. One example of special relevance to fragrances and air fresheners is DfE's work with formulators of chemical products to identify safer chemical alternatives for ingredients of concern and to recognize those formulators who develop safer chemical products through green chemistry. Cleaning products can contain a wide variety of ingredients including surfactants, solvents, builders, and fragrances. Fragrances are key ingredients in some cleaning products. To enable and further environmental stewardship in the fragrance industry, and to help fragrance houses identify safer ingredients for the formulation of fragrances in cleaning products, DfE is working with stakeholders from the fragrance industry, formulators of

cleaning products, environmental groups, and other Agency representatives. The goal of this stakeholder effort is to define safer fragrance materials for cleaning products, and provide fragrance houses and cleaning product formulators with a marketplace for those ingredients. Additional information on the DfE program in general and the formulators project in particular is available at: *http://www.cleangredients.org.*

**III. Disposition of Petition**

EPA has concluded that the petition does not set forth sufficient facts to support the petitioners' assertion that it is necessary to initiate the requested rulemakings under TSCA sections 4, 6, or 8(d). Furthermore, EPA has concluded that a TSCA section 8(c) data call-in is not a petitionable matter under TSCA section 21. A detailed explanation of EPA's determination follows.

*A. TSCA Section 8(c) Request*

The petitioners requested that EPA ''call-in allegations of adverse reactions recorded by manufacturers and processors [of air fresheners] pursuant to TSCA section 8(c) and 40 CFR part 717 [EPA's TSCA section 8(c) regulations].''

Section 8(c) of TSCA provides that ''[a]ny person who manufactures, processes, or distributes in commerce any chemical substance or mixture shall maintain records of significant adverse reactions to health or the environment, as determined by the Administrator [of EPA] by rule, alleged to have been caused by the substance or mixture,'' and that, ''[u]pon request of any duly designated representative of the Administrator, each person who is required to maintain records under [TSCA section 8(c)] shall permit the inspection of such records and shall submit copies of such records.'' 15 U.S.C. 2607(c). EPA issued regulations implementing TSCA section 8(c), 40 CFR part 717, which were published in the **Federal Register** issue of August 22, 1983 (48 FR 38187). These regulations provide that EPA may require that records of allegations of significant adverse reactions be reported either by letter or by notice in the **Federal Register**: ''EPA will notify those responsible for reporting by letter or will announce any such requirements for submitting copies of records by a notice in the **Federal Register**.'' 40 CFR 717.17(b).

The requested call-in is not a petitionable matter under TSCA section 21. Among the actions potentially available under TSCA section 8, only

rules are proper objects of a TSCA section 21 petition. Pursuant to TSCA section 8(c), and EPA's implementing regulations at 40 CFR 717.17, allegations of adverse reactions are not called in by rule. In contrast, other provisions of TSCA—including part of TSCA section 8(c)—require or authorize the Administrator to act by rule. Section 21 of TSCA allows any person to petition ''to initiate a proceeding for the issuance, amendment, or repeal of a rule under section 2603, 2605, or 2607.'' 15 U.S.C. 2620(a). EPA interprets TSCA section 21 to apply only to the enumerated actions. EPA believes the Congress reasonably chose to extend TSCA section 21 only to the specific rules and orders identified under TSCA section 21. In general, rules are more broadly applicable and more significant regulatory actions than individual implementation actions, such as TSCA section 8(c) call-ins. While TSCA section 21 provides for petitions for 2 types of orders, these rest on findings related to potential health or environmental risks, or production and release of, or exposure to, a chemical or mixture, and each requires potentially significant action by the recipient of the order. Congress chose not to extend TSCA section 21 to other kinds of agency implementation actions.

*B. Denial of TSCA Section 8(d) Request*

Petitioners requested that EPA promulgate a rule pursuant to TSCA section 8(d) to require submittal of heath and safety studies related to air fresheners, including lab results of ingredients and health effects from respiratory exposures. This request is denied. Petitioners have not set forth sufficient facts to establish that it is necessary to initiate the requested TSCA section 8(d) rulemaking.

First, in order to grant petitioners' request, air fresheners would have to be treated as a category of mixtures, rather than an individual chemical or particular mixture, and based on the limited analyses undertaken in responding to the petition, EPA does not believe that it would be appropriate at this time to treat the vast array of air freshener products as a category. The issues associated with addressing air fresheners as a category are further discussed in Unit III.C.1. Second, petitioners have not provided sufficient facts or information to support their assertion that air fresheners present an unreasonable, or even a significant, risk. Finally, even if petitioners had demonstrated that air fresheners present an unreasonable risk, they have not demonstrated that the requested TSCA section 8(d) rule would be necessary or

an appropriate tool to protect human health against that risk.

As described in Unit II.D., the information that the petitioners relied upon to support their request is not persuasive and is not adequate to support the assertion that air fresheners present a significant public health risk, much less an unreasonable risk.

The cost of this TSCA section 8(d) rule would be substantial for both the industry and the Agency. Although such a rule would not require industry to perform new testing, the scope of studies covered by the requested rule would be very broad. It is not clear whether the "manufacturers and processors" that would to be subject to the rule petitioners request are intended to include manufacturers and processors of air freshener ingredients as well as products. Such a rule would potentially cover a very large group of entities, products, and ingredients.

In addition, this rulemaking would require substantial Agency resources to develop, and significant Agency resources would also be required to analyze submitted studies on air fresheners.

Petitioners request EPA to use a TSCA section 8(d) rule to obtain ingredient information. While information on air freshener ingredients could be a useful starting point for assessing whether air fresheners present any significant health risk, TSCA section 8(d) does not provide an efficient or effective way to obtain ingredient information because a TSCA section 8(d) rule would only obtain the ingredient information that was part of a health or safety study. Section 8(d) of TSCA is not designed for, and is not an efficient or effective means of obtaining general or comprehensive ingredient information on air fresheners.

As a second general type of information, petitioners request EPA to use a TSCA section 8(d) rule to obtain information on "exposure of consumers to air fresheners," "health effects of exposure to air fresheners," and "toxicity, persistence, and other characteristics of air fresheners that affect health and/or the environment." EPA generally considers this type of information to be health and safety information, which could be obtained through a TSCA section 8(d) rule. However, air fresheners are mixtures of chemicals, not individual chemicals, and as such contain a large number and wide variety of different chemicals. As a result, the interpretation of individual air freshener study results could be very difficult. When assessing studies of mixtures it is frequently difficult to determine which chemical or combination of chemicals produced a

given result or caused a given effect. Further, the likely compositional diversity of the tested air freshener formulations presents EPA with difficulties in assessing the significance of any such health and safety studies in relationship to the ingredients and concentrations that are commonly present in commercially available air fresheners. Moreover, since air freshener ingredients are likely to change over time, the value or significance of health and safety study information on particular air freshener formulations could be limited.

EPA would want a better general understanding of air freshener ingredients before concluding that the broad rule requested by the petitioners is a necessary or efficient tool to address possible health effects associated with air fresheners. In addition, EPA currently does not view collection of TSCA section 8(d) information on air fresheners, or analysis of such information should EPA obtain it, as a high priority among the many chemical issues and activities that the Agency could potentially expend resources investigating, and the petitioners have not persuaded EPA otherwise.

Accordingly, EPA concludes that the petitioners have not set forth sufficient facts to support their assertion (and information available to EPA does not otherwise indicate) that it is necessary or appropriate to issue the requested TSCA section 8(d) rule.

## C. Denial of TSCA Section 4 Request

Petitioners requested that EPA promulgate a rule under TSCA section 4 to require "acute and chronic studies that use appropriate exposure routes and that capture a diversity of life stages and health conditions, such as asthma, for large populations of mammals evaluating the impact of air fresheners on human health. These tests must consider the byproducts of a reaction of the air fresheners with ozone and analyze both exposure and sensitization" (Ref. 1). This request is denied. Petitioners have not set forth sufficient facts to support their assertion that it is necessary to issue a TSCA section 4 rule, as required by TSCA section 21(b)(1).

In addition to the request for a TSCA section 4 testing rule with respect to "air fresheners" as described in the petition, petitioners also presented additional requests, orally and in written comments. EPA does not consider these additional requests part of the TSCA section 21 petition, but nonetheless does address the petitioners' suggested alternative approaches in this unit.

1. *TSCA section 4 request set forth in petition.* Petitioners have not set forth sufficient facts to support their assertion that it is necessary to issue a TSCA section 4 rule for air fresheners.

As a threshold matter, petitioners' request as articulated in the petition would entail treatment of "air fresheners" as a category of chemical substances or mixtures (almost certainly mixtures, since it is unlikely that any air freshener is composed of a single chemical substance). Petitioners present both their request and their support for the request in terms of "air fresheners." For example, the petition states, "air fresheners may pose a risk to public health" and defines air fresheners broadly to include a "broad range of product types," from sprays to "plug-ins" to potpourri. Thus, treatment of air fresheners as a category would be necessary to grant petitioners' request as articulated in the petition.

EPA has broad discretion to determine whether to regulate by category under TSCA section 26(c). Beyond the language of TSCA section 26(c), this discretion is evidenced by the fact that TSCA section 21(b)(4)(B)(i) provides an opportunity for a *de novo* hearing with respect to petitions for testing of chemical substances, but not for categories of chemicals or mixtures. As with mixtures, Congress left the complex issues associated with regulation by category to the Administrator's discretion. Congress intended this authority to "facilitate the efficient and effective administration" of TSCA. Senate Report No. 94–698 at p. 31.

While a broad category might be appropriate under certain circumstances, based on the limited analyses undertaken by EPA in responding to the petition, EPA does not believe that treating air fresheners as a category for the purposes of a TSCA section 4 testing rule would be appropriate, efficient, or effective at this time given the large number and wide variety of air fresheners. There is a vast array of mixtures and physical forms within the meaning of air fresheners that the petitioners provide. The category is so broad and varied that similar treatment for each member of the category (i.e., testing of each member) would not be practical, efficient or effective. In addition, EPA is not able at this time, nor would it be able in the reasonably foreseeable future, to identify a standard or standards for development of certain test data, as required by TSCA section 4(b)(1), that would be appropriate to the category as a whole. Specifically, EPA is currently not aware of any standard test

method for testing respiratory sensitization in animals. Given limited information and the lack of applicable standards, a testing rule for the category air fresheners would take years and a very large expenditure of resources for EPA to develop, promulgate and implement. In addition, a requirement to conduct the wide array of testing requested by petitioners would be costly for industry. The implementation of such a requirement would entail multiple methods to test a wide variety of products for each of the identified endpoints. Moreover, even if EPA could identify or devise appropriate test standards for respiratory sensitization, it is not at all certain that testing of air fresheners for this effect or other acute and chronic effects would provide useful data relevant to determining whether air fresheners as a class, or any particular chemical substances or mixtures, present an unreasonable risk. As described in Unit III.B., the interpretation of air freshener study results would be problematic.

Even if category treatment were appropriate, petitioners have not set forth sufficient facts and information to support the TSCA section 4 findings for air fresheners.

First, petitioners have not set forth facts sufficient to support the required finding for mixtures under TSCA section 4(a)(2): That the effects of air fresheners would not be "reasonably and more efficiently determined or predicted by testing the chemical substances which comprise the mixture." 15 U.S.C. 2603(a)(2). EPA has broad discretion to make this finding, and EPA does not, at this time, believe this finding is warranted. (TSCA section 21(b)(4)(B)(i) provides an opportunity for a *de novo* hearing with respect to petitions for testing of individual chemical substances, but not for mixtures.) On the contrary, based on the limited analyses undertaken by EPA in responding to the petition, identifying individual substances used in air fresheners and proceeding with additional requirements only where appropriate with respect to particular substances would be the more reasonable and efficient approach and would allow the Agency to target both public and private resources towards developing useful data. Given more complete information on the chemical substances, EPA might conclude that testing of some air freshener mixtures or ingredients would be appropriate, but petitioners provide no basis to support this finding for the category of air fresheners as a whole.

Petitioners assert that the testing of individual chemical substances alone

could lead to gaps in data about synergistic effects or byproducts of air fresheners with ozone. While this is possible, petitioners have not provided any information to support the assertion nor at present does EPA have any basis to evaluate the assertion.

In addition, petitioners have not set forth sufficient facts to support the other required TSCA section 4 findings as described in Unit II.B.2. For example, petitioners have not set forth sufficient facts for EPA to find that information available to the Administrator is insufficient to permit a reasoned evaluation of the health and environmental effects of air fresheners, or that testing of the air fresheners is necessary to develop missing data. 15 U.S.C. 2603. Petitioners have cited some information in an attempt to make these showings. For example, they point out that the EPA HPV Information System contains no repeat dose toxicity studies for respiratory exposure for the common fragrances reported in the BEUC study, and that more than 25 material safety data sheets (MSDSs) on air fresheners reviewed by the petitioners indicated no data are available for respiratory tract sensitization. This information could be suggestive of an insufficiency of data, but EPA cannot judge whether existing data or experience are insufficient to determine or predict the health effects of air fresheners and, even so, whether new testing would be necessary to develop such data without review of the additional available information. EPA's literature search indicates the existence of many published health and safety studies pertaining to the potential health effects of air fresheners or their ingredients (Ref. 24). Further, comments received on the petition indicate a large body of information created and maintained by the fragrance industry of which many are reported to be published in peer-reviewed scientific literature (Ref. 25).

In light of the large body of additional available information which was not considered by petitioners, the petition does not support petitioners' claims regarding the insufficiency of existing data or that testing is necessary.

For these reasons, the petitioners have not demonstrated that it is necessary or appropriate to issue the requested TSCA section 4 rule.

2. *Additional TSCA section 4 request articulated at meeting.* EPA met with petitioners at their request on October 24, 2007, to discuss this petition. At that time, petitioners indicated that they intended their TSCA section 4 request to be for the testing of individual chemical substances used in air fresheners, not the air fresheners

themselves (Ref. 26). A request to promulgate a TSCA section 4 rule with respect to either a category of chemical substances or individual chemical substances is significantly different from the request as articulated in the petition. Given the petitioners' obligation to articulate requests and set forth facts in their petition, EPA does not view this request as part of the petition. Nonetheless, EPA will address the alternative approaches identified by petitioners.

First, EPA does not believe the designation of "chemical substances used in air fresheners" as a category of chemical substances for the purpose of the requested TSCA section 4 testing rule is appropriate, for reasons similar to those discussed in Unit III.C.1. This category is extremely large, undefined and indiscriminate. It appears that petitioners are requesting that EPA require testing for all of the chemical substances in all air fresheners (Ref. 27, p. 1). This would be a massive testing rule—significantly larger than any EPA has ever promulgated before. In addition to the sheer scope of the requested rule, similar treatment for each member of the category would not be practical, efficient or effective. The chemical substances in air fresheners have not been completely identified, and EPA has no reason to believe that by virtue of their use in air fresheners, these substances would be appropriate for treatment as a category for the purposes of a TSCA section 4 rule. In addition, petitioners have failed to set forth facts sufficient to support the TSCA section 4 findings as described in Unit II.B.3. with respect to the category of "chemical substances used in air fresheners." The petitioners have not shown that the TSCA section 4 findings can be made for any chemical substance used in air fresheners. In addition, the category is likely to include chemicals that are benign, and/or are not produced in substantial quantities, and/or that have been extensively studied. Therefore, EPA does not believe that the requested testing of all chemical substances used in air fresheners should be applied.

To the extent petitioners seek testing on only some of the chemical substances used in air fresheners, petitioners have not specified for which ingredients testing should be required nor have they provided information that would enable EPA to make the TSCA section 4 findings with respect to any individual chemical substances. Petitioners have identified a few chemical substances used in air fresheners, but they have not set forth facts with respect to any individual

substances to support the TSCA section 4 findings. For example, petitioners identify phthalate esters as a category of chemicals they are concerned about, but they have not shown that phthalate esters as a category, or any particular phthalate ester, meet the findings under TSCA section 4(a)(1). In addition, with respect to phthalate esters, the NAS evaluation regarding phthalate esters will help inform consideration of the sufficiency of the existing data and the need for any testing.

3. *Additional TSCA section 4 request made in comments.* Through written comments on the petition dated November 5, 2007, petitioners presented an additional request for a rule requiring that ''[each of the] manufacturers [of air fresheners] specifically test at least one formulation for each category of air freshener that it sells'' (Ref. 27). EPA again considers this additional request to be different from the request in the petition, and not part of the petition, but will address the alternative approach identified by petitioners.

In order to require testing under TSCA section 4 on a particular mixture, the TSCA section 4 findings must be met with respect to the mixture to be tested. Petitioners' request is essentially for a rule requiring testing on individual mixtures, which they have identified as ''formulations.'' While petitioners' comments imply that any ''formulation'' might be a candidate for testing, they do not identify any particular mixture, nor have they provided a rationale for selecting which air fresheners should be tested.

The petitioners have not set forth facts sufficient to support their assertion that a TSCA section 4 testing rule is necessary with respect to any particular mixture. It is possible that some air freshener ''formulations'' may meet the standards for testing as described in Unit II.B.2., but the petitioners have not identified such a mixture or provided any information toward these findings. For example, the petitioners have not set forth sufficient facts to make the necessary finding under TSCA section 4(a)(2) with respect to any mixture. As described in Unit II.B.3., EPA would have to find that the effects of the mixture ''may not be reasonably and more efficiently determined or predicted by testing the chemical substances which comprise the mixture.'' 15 U.S.C. 2603(a)(2). Here, as described in Unit III.C.1., EPA currently believes that identifying individual substances used in air fresheners and proceeding with additional requirements only where appropriate with respect to particular substances, would be the more reasonable and

efficient approach. By way of further example, petitioners have also not set forth sufficient facts to show an insufficiency of data or necessity of testing for any particular formulations. Rather, ''air fresheners'' by the petitioners' own definition encompass a ''broad range of product types'' and varying formulations.

To the extent the petitioners assert that testing of some subset of air fresheners could be required as a category of mixtures, this approach presents the same problems identified in Unit III.C.1. While the category described in the petitioners' comment is not quite as sweeping as the request in their petition, it is still a very expansive and ill-defined category of mixtures, and more information and analysis would be needed to determine if such an approach even merits further consideration.

*D. Denial of Request to Issue TSCA Section 6 Labeling Rule*

The petitioners requested that EPA issue a rule under TSCA section 6(a)(3) requiring air fresheners to be labeled to identify all ingredients. This request is denied. Petitioners have not set forth sufficient facts to establish that it is necessary to initiate the requested TSCA section 6(a) rulemaking.

In support of their request, the petitioners assert that manufacturers and importers are already aware of the ingredients in their products, that their products are unnecessary, and that requiring the requested labeling would therefore impose an insignificant cost. The petitioners also assert that many of the chemicals present in air fresheners are toxic. However the petition does not provide a reasonable basis to conclude that air fresheners, or the chemicals used in air fresheners, present or will present an unreasonable risk of injury to health or the environment. In addition to the limitations of the three reports petitioners principally rely on, the petition does not provide a basis upon which to estimate the cost of the requested rulemaking. Furthermore, the petition does not provide a basis for finding that the action requested by petitioners would be necessary to protect adequately against any unreasonable risk, or that it is the least burdensome requirement that would adequately protect against such risk.

As a threshold issue, as with their other requests, the petitioners do not demonstrate that any particular air freshener or air freshener ingredient presents or will present an unreasonable risk. The petitioners do briefly discuss some specific risk issues, but their statements are not sufficient to support

any risk conclusions about any particular products or ingredients. For example, they cite the conclusions of the SCHER report that burning of some incense products available in Europe generated high benzene concentrations and that such ''benzene emissions need attention to diminish the exposure'' (Ref. 4). EPA does not believe this information is relevant, because the definition of air freshener provided by the petitioners does not appear to include incense. The definition in the petition does not include any products involving combustion—a process that raises issues significantly different from those raised by non-combustion products. In addition, combustion—whether of incense, candles, or anything else—creates chemicals that are not present in the original article, and it does not appear to EPA that the listing of ingredients in the article would be an effective means of protecting against any risk that might result from combustion of the ingredients.

Because the petitioners have not set forth sufficient facts with respect to any particular air freshener mixture or ingredient, EPA would have to treat air fresheners as a category of mixtures in order to grant the petitioners' request under TSCA section 6(a). This would result in a rule requiring labeling for a very broad product type, despite the fact that the petitioners have not shown that any specific air freshener, or air fresheners generally, present or will present an unreasonable risk. As described in Unit II.D., the information that the petitioners relied upon to support their request do not provide sufficient facts to support the assertion that air fresheners present or will present a significant risk, much less an unreasonable risk to human health or the environment. In addition, while not part of the petition, EPA also considered information provided by the petitioners and others during the public comment period. This information also did not provide a reasonable basis to conclude that air fresheners, or the chemicals in air fresheners, present or will present an unreasonable risk of injury to health or the environment.

In addition to the limitations of the risk information provided by petitioners, petitioners did not provide adequate information to address the other components of the unreasonable risk standard. These relate not merely to the effects of the mixture (i.e., air freshener), or the chemicals comprising the mixture, but also to the benefits of the substance(s) for various uses and the availability of substitutes for such uses and to the reasonably ascertainable economic consequences of the control

mechanisms proposed to control the risk.

These considerations are integral to the determination that there is a reasonable basis to conclude that a substance presents or will present an unreasonable risk, and the petitioners have not presented sufficient facts to address them. The petitioners asserted that the costs of their requested controls would be small and that the benefits of their controls would reduce risk, but provided no data or other information to substantiate either their estimates of cost or of the efficacy of their proposed control action. With respect to cost, contrary to petitioners' assertion, it seems likely to EPA that the cost of a rule requiring the listing of every ingredient of every air freshener would be substantial. The cost to the Agency of promulgating such a rule would also be very large. EPA would need to develop sufficient information to provide a reasonable basis to conclude that air fresheners as a category present or will present an unreasonable risk (it would need a record significantly more extensive than the information supplied by petitioner), and that product labeling is the least burdensome requirement that would adequately address that risk. The petitioners made no attempt to address this last requirement.

With regard to the benefits of air fresheners, even assuming air fresheners provide no public health value, this is not the only kind of benefit cognizable under TSCA. As petitioners recognize, air fresheners are purchased in large quantities, which suggests that consumers place significant value on them.

In sum, the petitioners have not set forth sufficient facts to establish that the requested rulemaking under TSCA section 6 is necessary, and EPA has denied the request.

**IV. Comments Received**

EPA published a notice in the **Federal Register** issue October 23, 2007 (72 FR 60016) (FRL–8154–5) announcing receipt of the petition and inviting public comment on or before November 7, 2007. EPA received 28 timely comments, 4 of which were from the petitioners. One of the comments was received the day after the comment deadline due to a delivery problem on the part of the courier. EPA decided to consider this comment with the others.

Eleven comments were from individuals who supported the petition. Several were allergy or asthma sufferers who felt that air fresheners aggravate their health problems. Several indicated a belief that manufacturers are not adequately testing their products and

were especially concerned about children and air freshener misuse.

Five comments were from health, environmental, or animal welfare non-profit organizations (Toxics Information Project, Environmental Health Coalition of Western Massachusetts, People for the Ethical Treatment of Animals (PETA), Ecological Health Organization (ECHO), and the American Lung Association of New England). Four of the five supported the petition, while the fifth, PETA, supported portions of the petition in principle, while opposing the portion calling for testing on large numbers of animals. PETA criticized some of the information that the petitioners cited in support of their petition, and argued that additional animal testing is not necessary and would not provide useful information on the effects of air fresheners on human health.

Eight comments were received from air freshener manufacturing companies named in the petition and from trade organizations representing manufacturers of fragrance and fragrance-related products. (Reckitt Benckiser, Soap and Detergent Association, Grocery Manufacturers/ Food Products Association, Fragrance Materials Association of the United States, Consumer Specialty Products Association, Dial Corporation, American Chemistry Council Phthalate Esters Panel, and Blythe, Inc.). All of these companies and organizations opposed EPA granting any part of the petition. The American Chemistry Council Phthalate Esters Panel and the Fragrance Materials Association of the United States (FMA) comments focused on the safety of several phthalate esters and the remainder of the commenters focused on air fresheners and fragrances generally.

The Consumer Specialty Products Association (CSPA) comments are representative of the industry comments, and almost all of the other industry commenters specifically endorsed CSPA's comment submission. The CSPA comment argued that the petition should be denied because:

1. There is inadequate evidence that air fresheners cause significant adverse reactions.

2. Sufficient air freshener safety data are already available to EPA.

3. The fragrance industry is already engaged in safety testing.

4. Labeling requirements are unjustified and duplicative of FHSA. CSPA's comments asserted that the fragrance industry is adequately self-regulating through an industry research and testing organization, Research Institute for Fragrance Materials, and an

industry standards-setting organization, International Fragrance Association. The comment included documents explaining the role of these organizations in the evaluation of ingredient safety by the fragrance industry. CSPA comments (and those from the two companies) explained the product stewardship programs used by Reckitt Benckiser and SC Johnson. CSPA's comments included their disagreements with and criticisms of the studies and data that petitioners used to support their position, and supplied additional studies that CSPA argued demonstrate the safety of fragrances and/or air fresheners.

The petitioners submitted four more comments, including two epidemiological studies: One on household cleaning sprays and adult asthma and one on prenatal phthalate ester exposure. Petitioners also submitted a press release about a National Institutes of Health (NIH) study concluding that exposure to 1,4-dichlorobenzene, a VOC, used in household cleaning products, may cause reductions in lung function. Finally, petitioners submitted a comment clarifying two terms used in their petition, and further defining the type and scale of testing they are petitioning for under TSCA section 4. Given the petitioners' obligation to clearly articulate requests and set forth facts in their original petition and the short span of time within which EPA must respond to the petition as written, EPA does not view the clarifications and scope modifications subsequently submitted in petitioner's comments as components of the petition. Nevertheless, EPA has considered and addressed petitioners' comments, as detailed in Unit III.

**V. References**

1. Sierra Club, Alliance for Healthy Homes, National Center for Healthy Housing and Natural Resources Defense Council. Letter from Ed Hopkins, Sierra Club; Robert Zdnek, Alliance for Healthy Homes; Rebecca Morley, National Center for Healthy Housing; and Mae C Wu, Natural Resources Defense Council to Stephen Johnson, Administrator, Environmental Protection Agency and Commissioner Thomas Moore, U.S. Consumer Product Safety Commission. Re: Citizen Petition to EPA and CPSC Regarding Air Fresheners. September 19, 2007.

2. CPSC. Letter from Lowell F. Martin, Acting General Counsel, Office of the General Counsel, U.S. Consumer Product Safety Commission, to Mr. Ed Hopkins, Director, Environmental Quality Program, Sierra Club; Ms. Rebecca Morley, National Center for

Health Housing; Mr. Robert Zdenek, Alliance for Healthy Homes, and Mae C. Wu, Natural Resources Defense Council. November 23, 2007.

3. Lai, M.W.; Klein-Schwartz, W.; Rodgers, G. C.; Abrams, J. Y.; Haber, D. A.; Bronstein, A. C.; and Wruk, K. M. 2006. 2005 Annual Report of the American Association of Poison Control Centers' National Poisoning and Exposure Database. *Clinical Toxicology.* 44:803–932.

4. European Commission, Scientific Committee on Health and Environmental Risks (SCHER). Opinion on the Report: ''Emission of chemicals by air fresheners: Tests on 74 consumer products sold in Europe'' (BEUC report January 2005). January 27, 2006.

5. Bureau Européen des Unions de Consommateurs (BEUC). The European Consumers' Organization. Emission of chemicals by air fresheners: Tests on 74 consumer products sold in Europe. 54 pp. January 2005.

6. Cohen, A. Janssen, S. and Solomon, G. ''Clearing the Air: Hidden Hazards of Air Fresheners.'' Natural Resources Defense Council. September 2007.

7. Reckitt Benckiser, Inc. Letter from Eileen J. Moyer, Director of Regulatory Relations, to Document Control Office, Office of Pollution Prevention and Toxics (OPPT), EPA. Docket ID number EPA–HQ–OPPT–2007–1016–0018.1. November 6, 2007.

8. EPA. Memorandum from Dirk F. Young, Environmental Engineer, Exposure Assessment Branch, Economics, Exposure, and Technology Division, to Robert Jones, Biologist, Chemical Information and Testing Branch, Chemical Control Division. Subject: Review of 2005 AAPCC on Air Fresheners. November 18, 2007.

9. EPA. E-mail communication from Tala Henry, Toxicologist, Risk Assessment Division, to Andrea Pfahles-Hutchens, Epidemiologist, Risk Assessment Division with E-mail communication response from Andrea Pfahles-Hutchens to Tala Henry. Re: Poison control reports. November 5 and 6, 2007.

10. CDC, HHS. Third National Report on Human Exposure to Environmental Chemicals. National Center for Environmental Health, NCEH Pub. No. 05–0570. July 2005. Available on-line at: *http://www.jhsph.edu/ephtcenter/Third%20Report.pdf.*

11. State of California. Proposition 65 List of Chemicals. September 27, 2007. Available on-line at: *http://www.oehha.ca.gov/prop65.html.*

12. SCCNFP. The Scientific Committee on Cosmetic Products and Non-Food Products Intended for Consumers. Opinion Concerning Diethyl Phthalate. December 9, 2003.

13. SCCNFP. The Scientific Committee on Cosmetic Products and Non-Food Products Intended for Consumers. Opinion Concerning Diethyl Phthalate. June 4, 2002.

14. Greenpeace. Perfume: An Investigation of Chemicals in 36 Eaux de Toilette and Eaux de Parfum. Greenpeace International. 16 pp. February 2005.

15. SCCP. Scientific Committee on Consumer Products. Opinion on Phthalates in Cosmetic Products. March 21, 2007.

16. NAS. The National Academies. Project Information: Health Risks of Phthalates. 2007 Available online at: *http://www8.nationalacademies.org/cp/projectview.aspx?key=48860.*

17. Europe Information Service. Product Safety: BEUC Report Claims Air Fresheners are ''Risk to Health.'' Europe Environment. February 18, 2005.

18. EPA. Memorandum from Conrad Flessner, Jr., Biologist, Exposure Assessment Branch, Economics, Exposure, and Technology Division, to Robert Jones, Biologist, Chemical Information and Testing Branch, Chemical Control Division. Re: Exposure Information Review of the Scientific Committee on Health and Environmental Risks (SCHER) Report on Air Fresheners (December 13, 2007).

19. A Summary of General Assessment Factors for Evaluating the Quality of Scientific and Technical Information, U.S. EPA, EPA 100/B–03/001 (June 2003).

20. EPA. Memorandum from Andrea Pfahles-Hutchens, Epidemiologist, Existing Chemicals Assessment Branch, Risk Assessment Division, to Robert Jones, Project Manager, Chemical Information and Testing Branch, Chemical Control Division. Subject: Review of Epidemiology Studies for TSCA Section 21 Petition. November 27, 2007.

21. EPA. Screening Review of Literature for Air Freshener Exposure Information. Submitted by Versar Inc., to U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics. EPA Contract No. EP–W–04–035. November 20, 2007.

22. Zock, J-P; Plana, E; Jarvis, D.; Anto, J. M.; Kromhout, H.; Kennedy, S.M.; Kunzli, N.; Villani, S.; Olivieri, M.; Toren, K.; Radon, K.; Sunyer, J.; Dahlman-Hoglund, A.; Norback, D., and Dogevinas, M. 2007. The Use of Household Cleaning Sprays and Adult Asthma: An International Longitudinal Study. *American Journal of Respiratory and Critical Care Medicine.* 176: 735–741.

23. Caress, S. M. and Steinemann, A. C. 2005. National Prevalence of Asthma and Chemical Hypersensitivity: An Examination of Potential Overlap. *Journal of Occupational and Environmental Medicine.* 47:518–522.

24. EPA. E-mail communication with sample search results from Randall Brinkhuis to Greg Schweer. Subject: Search strategy and results for TSCA section 21 petition on air fresheners. December 3, 2007.

25. CSPA. Consumer Specialty Products Association. Letter with enclosure from Robert A. Matthews, McKenna Long and Aldridge, LLP, to Document Control Office, Office of Pollution Prevention and Toxics (OPPT), EPA. Docket ID number EPA–HQ–OPPT–2007–1016–0029.1. November 7, 2007.

26. EPA. Minutes of meeting held October 19, 2007, between EPA and petitioners. Re: TSCA section 21 petitioners on air fresheners. October 19, 2007.

27. NRDC. Letter with attachment from Mae C. Wu, Natural Resources Defense Council and Ed Hopkins, Sierra Club on behalf of petitioners. Re: Docket ID number EPA–HQ–OPPT–1016, to Document Control Office, Office of Pollution Prevention and Toxics (OPPT), EPA. Docket ID number EPA–HQ–OPPT–2007–1016–0013.1. November 5, 2007.

28. Sara Lee B.V. v. BEUC, KG 05/64 (March 8, 2005).

29. Cosmetic Ingredients Review (CIR) Expert Panel, 2005. Annual Review of Cosmetic Ingredient Safety Assessments—2002/2003. *International Journal of Toxicology.* 24 (Supp. 1); 1–102.

30. CEPA. California Environmental Protection Agency, Office of Environmental Health Hazard Assessment, Reproductive and Cancer Hazard Assessment Branch. 2007. Proposition 65 Safe Harbor Levels: No Significant Risk Levels for Carcinogens and Maximum Allowable Dose Levels for Chemicals Causing Reproductive Toxicity. October 2007.

**List of Subjects**

Environmental protection, Air fresheners, Phthalates, Volatile Organic Compounds (VOCs).

Dated: December 18, 2007.

**James B. Gulliford,**

*Assistant Administrator, Office of Prevention, Pesticides and Toxic Substances.*

[FR Doc. 07–6176 Filed 12–19–07; 11:51 am]

**BILLING CODE 6560–50–S**